INTERNATIONAL TRANSPORT, INC.,
Plaintiff,

C & H Transportation Co., Inc., and J. H.
Rose Truck Line, Inc., Intervening
Plaintiffs,

v.

UNITED STATES of America and In-
terstate Commerce Commission,
Defendants (two cases).

LEONARD BROS. TRUCKING CO., Inc.,
Plaintiff,

C & H Transportation Co., Inc., and J. H.
Rose Truck Line, Inc., Intervening
Plaintiffs,

v.

UNITED STATES of America and In-
terstate Commerce Commission,
Defendants.

Nos. 2136, 2141 and 2144.

United States District Court,
W. D. Missouri,
Southwestern Division.

Jan. 21, 1972.

Karl Schmidt, Morrison, Hecker, Cozad, Morrison & Curtis, Kansas City, Mo., Van Osdel, Foss, Johnson & Miller, Fargo, N. D., Lord, Bissell & Brook, Chicago, Ill., for International Transport Inc.

Helliwell, Melrose & DeWolf, Miami, Fla., Turney & Turney, Washington, D. C., for Leonard Bros. Trucking Co., Inc.

Stephen P. Murphy, Kansas City, Mo., for Munitions Carriers Conference, Inc.

Lawrence R. Brown, Stinson, Mag, Thomson, McEvers & Fizzell, Kansas City, Mo., for Tri-State Motor Transit Co., Hughes Transportation, Inc., Riss & Co., Inc. and C. I. Whitten Transfer Co.

Shelby Highsmith, Miami, Fla., Rice, Carpenter, & Carraway, Washington, D. C., for Regular Common Carriers Conference.

J. Thomas Cardwell, Orlando, Fla., for Gateway Transportation Co., Inc.

Calvin K. Hamilton and Paul A. White, Asst. U. S. Attys., Kansas City, Mo., John D. Wigger, Gen. Counsel, Dept. of Justice, Manny H. Smith, Washington, D. C., I.C.C., for the United States and I.C.C.

HUNTER, District Judge.

This proceeding concerns the right of the respondent heavy-hauler, International Transport, Inc., to transport 500 and 750 pound bombs on pallets each of which, when loaded, weigh in excess of 3,000 and 1,700 pounds respectively, pursuant to its motor common carrier authority to haul commodities which because of size or weight require the use of special equipment. Two prior reports of the Interstate Commerce Commission found that International did not have that right. See, 108 M.C.C. 275 and MC–C–5766 dated October 29, 1971. The matter is now before us for review and appropriate action.

*History of the Litigation*

Plaintiff, International Transport, Inc., a North Dakota Corporation, is a motor common carrier holding, in addition to other certificates, No. MC–113855 (Sub. No. 84) which authorizes the transportation of commodities which by reason of size or weight require the use of special equipment (a) from Beresford,

Sioux Falls, Dell Rapids and Hawarden, South Dakota, to points in California and Washington, and (b) between points in South Dakota, on the one hand, and on the other, points in Nebraska and Indiana.

Assertatively in reliance upon the decision of the Interstate Commerce Commission in Moss Trucking Co., Inc., Investigation of Operations, 103 M.C.C. 91 (1966) International commenced the transportation of a wide line of palletized explosives, including 500 and 750 pound bombs, from military ammunition depots in the midwestern United States to ports of embarkation on the Pacific Coast. In June, 1967, four motor common carriers [1] of explosives instituted a legal action [2] in the United States District Court for the Western District of Missouri, Southwestern Division, seeking an injunction against the transportation of any and all commodities described by federal regulation as Class A and B explosives.[3] The District Court (Judge Hunter) after an evidentiary hearing found that the questioned activities, insofar as they involved the movement of boxed and packaged consignments not exceeding 150 pounds in weight, were outside the scope of International's authority and issued a preliminary injunction against the continuance of such transportation. (Civil Action No. 2054, Tri-State Motor Transit Co. v. International Transport, Inc.) In that action Judge Hunter also determined that the status under "size and weight" authority of the 500 and 750 pound bombs, as well as the more basic and broader question of the right of heavy haulers to transport explosives generally, were matters appropriately within the primary jurisdiction of the Interstate Commerce Commission in the exercise of its expertise. Accordingly, Judge Hunter withheld decision on these issues, and, as a result, the Interstate

---

1. Tri-State Motor Transit Company, Hughes Transportation Company, Inc., Riss and Company, Inc., and C. I. Whitten Transfer Company were either originally in the action or came into it as intervenors.

2. The action was premised on the so-called "self-help" statute, 49 U.S.C. § 322(b) (2).

3. A commodity list of explosives and other dangerous articles is set forth in the regulation, 49 C.F.R. § 172.

Commerce Commission on September 14, 1967, instituted an investigation in Docket No. MC–C–5766 to determine whether International was and had been transporting commodities not authorized under its certificate, namely, 500 and 750 pound bombs. The initiating order directed the Bureau of Enforcement to participate as a party. Certain motor and rail carrier associations, a number of individual motor carriers, and the Department of Defense intervened in the proceedings in accordance with what they believed to be their particular interests.[4] After an evidentiary hearing before the full commission it found, and held International to be without authority to transport the 500 and 750 pound bombs in interstate commerce.[5]

International then filed a Bill of Complaint in the Southwestern Division of the Western District of Missouri to set aside the Commission's order (Civil Action No. 2136). International also filed an identical appeal from the same order of the Commission in the United States District Court for the District of North Dakota. That case, by stipulation of the parties, has been transferred to the Southwestern Division of the Western District of Missouri where it became Case No. 2141.

Leonard Brothers, an intervenor before the Commission in its mentioned investigation, appealed from the Commission's order therein in the United States District Court for the Southern District of Florida, Miami Division. The three-judge court in that proceeding transferred it to this court where it became Case No. 2144.[6] The two appeals of International (Cases Nos. 2136 and 2141) and the appeal of Leonard Bros. (Case No. 2144) have been consolidated by order of court.[7]

## Jurisdiction

■ The jurisdiction and venue for review of the Interstate Commerce Commission report and orders here in question is in the Western District of Missouri.

■ The Interstate Commerce Commission order before us arose out of Judge Hunter's action in Civil Action No. 2054 including his stay of the self-help proceedings in accordance with Section 322(b) (3) and his referral of the matter to the Interstate Commerce Commission for primary determination within the meaning and provisions of 28 U.S.C. §§ 1336(b) and 1398(b).[8] From

4. The Department of Defense, the Heavy-Specialized Carriers Conference of the American Trucking Associations, Inc., and Leonard Bros. Trucking Company, Inc., intervened in support of International. The Munitions Carriers Conference, Inc., the Regular Common Carrier Conference of the American Trucking Associations, Inc., the Western Rail Carriers, Baggett Transportation Company, Tri-State Motor Transit Company, Hughes Transportation, Inc., and Yellow Freight System, Inc., intervened in opposition to International's position. All have participated and have filed briefs.

5. See, Report of the Commission, December 31, 1968, No. MC–C–5766.

6. Leonard Bros. Trucking Co., Inc., v. United States, 301 F.Supp. 893 (S.D. Fla.1969). Leonard Brothers believes the transfer to be erroneous but has elected to accede to the transfer. See its brief, page 6, footnote 2.

7. The United States was not a party in the suit in the Western District of Missouri, nor in the first proceeding before the I.C.C. At its request, it was permitted to intervene in the instant three-judge court proceeding.

8. A three-judge district court in Leonard Bros. Trucking Co., Inc. v. United States, 301 F.Supp. 893, 897 (S.D.Fla.1969), determined that jurisdiction and venue over reviews of the I.C.C. order here in issue were exclusively in this Court pursuant to 28 U.S.C. §§ 1336(b) and 1398(b). The court found that the Order was one that arose out of a referral by Judge Hunter in Civil Action No. 2054, Southwestern Division of this Court. The court stated:

"   .   .   .   we thus hold that when a district court stays 'self-help' proceedings pursuant to section 322(b) (3), it 'refers a question or issue to the Interstate Commerce Commission for determination' within the meaning of 28 U.S.C.A. §§ 1336

their briefs it appears that some of the parties are doubtful as to whether § 1336 (b) gives review jurisdiction to a single-judge court or to a three-judge court where a one-judge district court refers a question to the Interstate Commerce Commission.

Three-judge court jurisdiction as contrasted with single judge court jurisdiction in matters such as this has disturbed the efficient administration of justice for many years. To ameliorate the problem, on August 30, 1964, Congress enacted Public Law 88–513, which in pertinent portion reads: "(b) When a district court or the Court of Claims refers a question or issue to the Interstate Commerce Commission for determination, the court which referred the question or issue shall have exclusive jurisdiction of a civil action to enforce, enjoin, set aside, annul, or suspend, in whole or in part, any order of the Interstate Commerce Commission arising out of such referral."

Prior to the enactment of Public Law 88–513 whenever the Court of Claims or District Court referred the issue to the Interstate Commerce Commission for a resolution, the Commission order emanating therefrom was subject to judicial review by a three-judge district court, pursuant to 28 U.S.C. §§ 1336, 1398, 2284, 2321–2325, rather than by the referring court. Consequently, the referring court had to await the decision of the three-judge court, the Supreme Court, if an appeal was taken, and any other proceedings which might result from such judicial decisions, before it could proceed to final judgment. See Pennsylvania R. R. v. United States, 363 U.S. 202, 80 S.Ct. 1131, 4 L.Ed.2d 1165 (1960).

The 1964 amendment to 28 U.S.C. §§ 1336 and 1398, Public Law 88–513, authorizing the referring court to have exclusive jurisdiction to review the Commission's order resulting from the referral, was designed to overcome this "cumbersome and inefficient" procedure. S. Rep.No.1394, 88th Cong., 2d Sess. 2 (1964), U.S.Code Cong. & Admin.News, 1964, p. 3235; H.R.Rep.No.1015, 88th Cong., 1st Sess. 2 (1964).* Thus, since the 1964 amendment, the referring court, rather than a three-judge district court, has reviewed the Commission's order because of its exclusive jurisdiction. See, McLean Trucking Co. v. United States, 181 Ct.Cl. 170, 387 F.2d 657, 659–660 (1967); Seaboard Air Line R. R. v. United States, 181 Ct.Cl. 719, 387 F.2d 651, 654–655 (1967) **; Leonard Brothers Trucking Co. v. United States, 301 F.Supp. at 896.[9]

---

(b) and 1398(b). Therefore, the Commission's order in its International Transport decision was 'referred' to the Commission by the United States District Court for the Western District of Missouri, and under 28 U.S.C.A. §§ 1336(b) and 1398(b) jurisdiction and venue are proper only in that District." 301 F. Supp. at 898

There have been cases that have interpreted Section 1336(b) to mean that if a one-judge district court referred a question to the I.C.C., any review of an order arising out of such a referral must only be before that one-judge court. Keller Industries v. U. S., 304 F.Supp. 852, (N.D.Fla.1969) (see CCH, 1969 Federal Carriers Cases, ¶ 82,124); Elgin, Joliet and Eastern Ry. Co. v. Benjamin Harris & Co., 245 F.Supp. 467 (N.D.Ill. 1965). See also Seaboard Air Line R. R. v. U. S., 181 Ct.Cl. 719, 387 F.2d 651, 654–655 (1967); McLean Trucking Co.

v. U. S., 181 Ct.Cl. 170, 387 F.2d 657, 659–660 (1967).

* These congressional reports, at p. 2, cited a situation where a case had been on the referring court's docket for ten years while full review of the Commission's order was being effected before other courts.

** There have been legislative proposals to make Commission orders subject to judicial review by the United States Court of Appeals, rather than by statutory three-judge district courts. Even under these proposals, however, Commission orders made pursuant to a referral from a district court or the Court of Claims would continue to be reviewed by the referring court. See, e. g., S.Rep.No.1499, 90th Cong., 2d Sess. 3 (1968).

9. See, also, Elgin, Joliet and Eastern Ry. Co. v. Benjamin Harris & Co., (N.D.Ill.1965) 245 F.Supp. 467; and

All three judges have concurred in the instant decision, including Judge Hunter, both in his capacity as the one-judge court which referred the matter to the Interstate Commerce Commission, and as a member of the three-judge court. Therefore, no possible problem is presented, and it is not necessary to further discuss venue and jurisdiction.

## Background of the Dispute

### The First Hearing By The Interstate Commerce Commission

As earlier indicated, the Commission had two hearings, both resulting in its finding and order that International as a heavy hauler had exceeded its certificate authority in transporting 500 and 750 pound bombs (palletized) and should cease and desist all such carriages. In its initial hearing the Commission related in some detail the background and history of the federal regulation of the transportation of explosives for hire. Shortly after motor carriers came under its jurisdiction the Interstate Commerce Commission under its statutory authority to classify,[10] developed a system of classifying and identifying carriers, among other ways, by the type of commodity carried.[11] Some seventeen specific classifications were declared, and classification No. 16 was "carriers of explosives or dangerous articles". It is reasonably clear that at that time no other existing motor carrier classification authorized, encompassed or contemplated the transportation of explosives.

Certainly at the time of the inception of Federal Motor Carrier regulations what are now known as heavy-haulers did not possess authority to transport explosives.[12] By what can be best described as an evolutionary process heavy-hauler classifications came to be one described mainly by reference to the type of service performed.[13] Eventually their commodity description read, "Commodities which by reason of size or weight require the use of special equipment."

Leonard Bros. Trucking Co., Inc. v. United States, (S.D.Fla.1969) 301 F. Supp. 893.

10. 49 U.S.C. § 1 declares the National Transportation Policy, and following sections commit to the I.C.C. the implementing and enforcement of that policy.

11. See, Classification case 2 MCC 703 (1937). No. 16 reads:

"(16) *Carriers of explosives or dangerous articles:* Carriers of certain explosive or dangerous articles, except liquid petroleum products as described in commodity group 4, and films as described in commodity group 12, are those carriers which engage in transporting dangerous, less dangerous, or relatively safe explosives, including nonexplosive material such as fuses, cartridge cases, dummy cartridges, etc., inflammable oxidizing materials, corrosive liquids, compressed gases, poisonous articles, and other acceptable dangerous articles other than inflammable liquids in tank vehicles.

"Note—The transporation of the commodities classed in this group involves unusual hazards and requires special precautions in the matter of safety. The carriage is usually rendered under special agreement but is also rendered by common carriers when the volume of the movement is not sufficient to warrant a contract operation."

In Riss & Co., Extension—Explosives, 64 M.C.C. 299 (1935) the commission stated:

"Congress recognized the need for protecting the public against the hazards involved in the transporation of explosives as early as 1866; and in 1908, pursuant to Transportation of Explosives Act, we issued regulations applicable to railroads. Since then, other legislation has been enacted under which regulations have been issued from time to time, and in 1934 we first issued regulations governing the transportation of explosives and dangerous articles by motor truck or other vehicles on the public highways. These regulations have been amended in various respects, and today comprehensive rules and regulations governing the transportation of explosives and other dangerous articles by rail and motor are in effect covering interstate and foreign commerce."

12. See Classifications Case, 2 M.C.C. 703, 710.

13. See, Osborne Common Carrier Application-Heavy Materials, 37 M.C.C. 633. Ace Doran Hauling & Rigging Company, Investigation of Operations, MC–C 4397 (May 1969); Gallagher Common Carrier Application, 48 M.C.C. 413.

It is undisputed that this description did not include such items as bulk liquid, petroleum products, household goods, refrigerated products regardless of their size or weight or special equipment. These mentioned items and others were transported by carriers other than heavy haulers.

The Commission also noted that it is undisputed that until the Moss Trucking Co., Inc., case [14] in 1966 heavy haulers had not exhibited any interest in transporting explosives and had not transported explosives.

### The Second Hearing By The Interstate Commerce Commission

The Commission's second hearing resulted from the reviewing courts' [15] remand [16] of the matter to it on March 18, 1970, to consider the effect, if any, of a regulation promulgated by the Department of Transportation (49 C.F.R. 177.-835(b) [17] and to possibly take and consider additional evidence concerning some of the more closely disputed matters.

At its second hearing, in the reopened proceedings, the Commission had the benefit of substantial additional evidence relevant to the issues to be decided. It accepted the view of the General Counsel of the Department of Defense that its regulation prohibiting the rolling of certain containers of explosives did not apply to nor prohibit the use of manual rolling to load and unload suitably banded and protected defused bombs, and that there was nothing in the Department of Defense's explosive handling regulations which would detract from the Commis-

sion's prior finding that as a practical matter 500 and 750 pound bombs are capable of being manually rolled. And after reviewing the new evidence before it, making its findings and giving its reasons in painstaking detail, it again determined the transportation of 500 and 750 pound bombs by International is not authorized by its certificate of public convenience and necessity and that such transportation has been and is violative of section 206(a) of the Interstate Commerce Act. It entered its order requiring International to cease and desist from the performance of these unauthorized operations.

In giving its reasons for its decision the Commission discussed what it termed to be the more fundamental tenets of heavy-hauler case law, saying: "Whether size and weight carriers may transport 500- and 750-pound bombs—or for that matter any article categorized by regulation as a Class A or Class B explosive—is an issue which by itself is of major transportation importance. Yet, even this vital issue is but one phase of the still broader regulatory problem which has existed with respect to the legitimate scope of heavy-hauling rights generally. That critical question stems from the fact that in order to achieve the savings in time, cost, and labor, which incontrovertibly accrue from the use of aggregation and mechanized loading and unloading procedures, shippers of virtually every commodity are resorting more and more to such present-day handling techniques in the transportation of their products. It has been contended by the heavy haulers and by some of their customary shippers that the foregoing con-

14. Moss Trucking Co., Inc., Investigation Operations, 103 M.C.C. 91.

15. On September 29, 1969, the undersigned three-judge court was designated pursuant to 28 U.S.C. § 2284 to hear the consolidated proceedings. As a three-judge court and also Judge Hunter as the single-judge court made the remand order to I.C.C.

16. International Transport, Inc., et al., v. United States, 318 F.Supp. 763 (W.D. Mo.1970).

17. 49 C.F.R. #177.835(b) provides: "(b) Care in loading, unloading, or handling of explosives. No bale hooks or other metal tools shall be used for the loading, unloading, or other handling of explosives, nor shall any package or other container of explosives, except barrels or keys, be rolled. No packages of explosives shall be thrown or dropped during process of loading or unloading or handling of explosives."

siderations are sufficient, in and of themselves, to establish a "requirement" for special equipment. That contention was explored in depth in this Commission's report on reconsideration in the *Doran* case, *supra*, which was issued shortly after the prior report in the instant proceeding. While Doran in no way discounted the benefits to be derived from automated handling procedures, it rejected the contention that such benefits should be accorded controlling weight in determining whether the commodity falls within the scope of size and weight authority. In so doing, it was observed that:

'For instance, it should not be manifest to all sides of the controversy that the requisite clarity and stability of heavy-hauler rights are totally incapable of achievement through any such principles of construction as accord sole or controlling weight to so-called industry practice and to such related concepts as economy and efficiency. Thus, the record now before us, as well as those developed in the other pending and recently decided cases bringing into issue the perimeter of size and weight authority, evince rapidly accelerating trends, based largely on what are indisputably valid present-day concepts of economy and efficiency, toward the industrywide use of (a) mechanized devices to handle medium-sized (i. e., 75- to 250-pound), individually shipped items, and (b) palletization or other forms of aggregation in the marketing of virtually every type of product whose movement is subject to Federal motor carrier regulation. In view of these established facts of 20th-Century commercial life, there would be few, if any, commodities outside the scope of heavy-hauler franchises were such rights to be interpreted principally on the basis of prevailing industry and shipper usage. Instead of a healthy competitive balance between the heavy haulers and non-size and weight carriers, the inevitable result of such an alchemic approach to the problem would be an obliteration

of any meaningful distinction between the affected spheres of motor carriage and, in consequence, chaos throughout the transportation industry. Nor do we view the foregoing construction as in any way mandated by the *Moss* or *Aero* decisions. Both our prior and subsequent discussions of the matter make clear, we think, that these cases visualize a decisional technique not markedly dissimilar from the balanced consideration of established precepts to which we have already referred. However, at this juncture it is sufficient to restate that *Moss*, while requiring that industry practice be taken into account, specifically asserts at page 108 that it is "not to be the determinative factor," and to point out that virtually all of the commodities were therein found proper for heavy-hauler participation, because of factors bearing upon either their size (e. g. 273-pound aluminum tanks), or their inherent need for palletization (e. g., aluminum ingots), within the orbit of size and weight carriage recognized in earlier decisions.' 108 M.C.C. at 732–33.

"Then, after casting aside the plainly erroneous approach to the construction of heavy-hauling franchises whereby controlling weight would be placed on the purely theoretical possibility that a commodity can be physically handled,[23] this

"23. This decisional technique was judicially condemned in Aero Trucking, Inc., v. United States, *supra*. It has been contended in the *Doran* case, as well as in the instant proceeding, that the *Aero* case requires the placing of greater weight on considerations of industry practice, economy, and efficiency, then was envisioned by the *Dillner* report. As was emphasized in Ace Doran at 108 M.C.C. 735, however, Aero reaffirmed the *Dillner* criteria without modification, and in a classic application of such criteria *uncontradicted evidence*, was found to have removed the commodities involved (i. e., aluminum ingots) from the *general rule* regarding palletized commodities." ·

Commission went on to find that the most practical and readily available solution to the problem lay in the balanced appli-

cation of previously enunciated heavy-hauler case law precepts.[24] As summa-

"24. 108 M.C.C. at 735–743.

rized in *Doran* at 108 M.C.C. 757, those principles are as follows:

"(1) With respect to bundled, aggregated or palletized commodities the presumption described in the Dillner case, 79 M.C.C. 335, at 358—that such shipments, in the absence of a sound basis for a contrary conclusion, are outside the scope of heavy-hauler authority—is reaffirmed without modification.

"(1a) That, again in accordance with Dillner, *exceptions to the foregoing general rule* will not be recognized when the use of aggregation is attributable *solely* to considerations relating to economy and efficiency; but, once a commodity's "inherent nature" is found to necessitate aggregation, these concepts must be taken into account in determining the minimum sized bundle required. (Emphasis ours.)

"(2) That irrespective of whether they are tendered in aggregated or single-unit form, commodities such as classes A and B explosives, bulk commodities, or household goods, are likewise presumed in accordance with the International Investigation case, 108 M.C.C. 275, to be without the permissible scope of heavy-hauler service; and that in these cases *exceptions will be recognized only when a clear basis is shown therefor*. (Emphasis ours.)

"(3) That future determinations as to whether the presumptions set forth in (1) and (2) above have been overcome as well as those regarding the status under size and weight authority of individually shipped articles generally should be guided by a balanced consideration of the following: (a) the commodity's basic characteristics,

(b) industrywide (not individual shipper) practices with regard to its handling, (c) prior methods employed in shipment of the involved or analogous commodity, and (d) its traditional sphere of carriage.

"*The general rule of construction* previously enunciated in the instant proceeding is to the effect that classes A and B explosives are presumed, in the absence of a sound basis for concluding otherwise, to be beyond the heavy-hauling perimeter." [18] (Emphasis ours.)

\* \* \*

"Turning to that evaluation, we will examine first the basic characteristics of the involved commodities considered as individual units. This phase of our analysis will be confined to the 500- and 750-pound bombs actually handled by respondent. Such objects, we admit, clearly fall within the weight range (i. e., substantially more than 200 pounds) which has been historically recognized as indicating a lack of susceptibility to manual lifting.[26] Thus, the dimensions

26. See the *Doran* report supra, 108 M.C.C. 717, at 723; Telischak Trucking, Inc., Extension—Concrete Commodities, 82 M.C.C. 109 (1959).

of the involved bombs must be said to operate in favor of the heavy-hauler's right to handle them. Yet, it has been recognized in *Doran*, as well as in other heavy-hauler cases summarized therein, that notwithstanding an article's size and weight, its susceptibility to loading and unloading by conventional means other than manual lifting may be sufficient to place such an object beyond the pale of heavy specialized carriage.[27]

27. Such other ordinary handling procedures include rolling, pushing, self-propulsion, and driving. See *Doran*, 108 M.C.C. at 722, and the cases there cited.

In this connection, there is evidence pointing toward the use of hand rolling to load and unload the 500- and 750-

18. The *Dillner* presumption, as well as the Doran summation of the existing state of heavy-hauler case law, were subsequently followed in Steel Haulers, Inc. Ext.-Tulsa, Okla., 110 M.C.C. 612 at 617–19 (1969).

The *Steel Haulers* decision is administratively final, and Certificate No. MC–119700 (Sub-No. 9) embracing the operations authorized in that proceeding was issued on June 18, 1970.

pound bombs which were manufactured prior to 1966. Like such formerly made articles, the bombs transported by International are round objects and thus lend themselves, in theory at least, to handling by similar means. The currently produced 500- and 750-pound bombs differ, however, from the previously shipped models in that the former are slimmer and have smooth skins. Moreover the 500-pound bombs are now shipped without the suspension lugs which had been used to affix the shipping bands necessary to protect the bombs from such physical damage as might otherwise result in the rolling process.

"These variations between the current and prior models of the involved commodities would seem to account for the different opinions which have been expressed on the question of whether the presently made objects could as a practical matter be wrapped or coated so as to permit their being manually handled. We will determine this crucial issue in connection with our evaluation of the involved commodities under the third criterion discussed in *Doran* and *Steel Haulers* (i. e., past handling methods). First, however, we shall examine the practices used to transport such bombs.

"It is beyond dispute that 500- and 750-pound bombs are now, and have been since 1966, almost universally shipped in palletized lots ranging in weight from approximately 1,700 to 3,000 pounds, and that automated devices are always used to load and unload not only such aggregated consignments but the occasional single unit shipments of the considered items as well. Even so, the prior report, faced with essentially this same factual situation, found that 'the unmistakable thrust of the evidence pertaining to this subject [palletization] as adduced from competent witnesses representing both sides of the controversy shows that the considered procedure is of recent institution, is employed almost entirely for reasons of economy and efficiency, and is in no way required by considerations such as safety or protection which bear upon the inherent nature of the articles themselves.' [28]

[28.] 108 M.C.C. 275 at 294.

"While the above key finding was not referred to by the Missouri District Court, we find nothing in the record as supplemented by further hearing which casts doubt on its validity. To be sure, the evidence previously discussed (*supra*, p. 18) indicates that palletization during production is dictated in large measure by safety considerations in order to permit cooling of the explosives by placing the bombs in an upright position. Be that as it may, we have consistently rejected any such construction of heavy-hauler authority as would place an object within the size and weight purview merely because unusual manufacturing or production conditions call for its being handled more safely with special equipment.[24] In this proceeding

[24.] See, for example, the conclusions in *Doran* at 108 M.C.C. 747–48, where 150-pound steel rails were placed outside the scope of heavy-hauling authority even though the layout of the interested shipper's plant was such that special handling was required in the interests of safety.

there is no showing that such factors require aggregation of 500- and 750-pound bombs for shipping. Indeed, there is nothing in the record to show, for example, that considerations of safety require that the bombs be maintained in a vertical posture after completion of the cooling period. They are, in fact, transported in a horizontal position. Thus, there exists no plausible basis other than those related to economy and efficiency for concluding that the objects must be aggregated for shipment from, to cite but one obvious example, ammunition storage depots. Accordingly, the practices which must be followed with respect to the handling of bombs transported directly from the production line in no way detract from this Commission's prior conclusions that the current aggregation of such bombs stems mainly from considerations related to economy and efficiency."

\* \* \* \* \* \*

"Accordingly, we believe that the record provides sound basis for concluding that prior to 1966, 500- and 750-pound bombs could be and were loaded and unloaded through conventional unmechanized handling methods.

"Aside from the fact that the presently made bombs of both dimensions have smooth skins and are somewhat slimmer than the earlier models, and except for the shipment of the 500-pound bombs without protrusions, the articles handled by International do not appear to vary in their basic properties from those which were rolled at an earlier time. In accordance with the District Court's suggestion, the immediate issue thus becomes whether such differences are so significant as to preclude a finding that, as a practical matter, the currently produced 500- and 750-pound bombs can be afforded the protection necessary to enable their being manually handled."

\* \* \* ". . . . those facets of the record bearing on past handling methods must be found to indicate a reasonable susceptibility of the presently made 500- and 750-pound bombs to manual handling.

"We of course are aware of the fact that the undoubted economies and efficiencies offered by palletization and automated materials handling techniques might well render unnecessary the expenditure of money and effort toward the development of suitable protective devices for the current model bombs. Nevertheless, the principles followed in *Doran* and *Steel Haulers* as well as the prior report in the instant proceeding, specifically reject any such interpretation of size and weight authority as would sanction heavy-hauler participation in a given carriage merely because modern technology has rendered manual handling obsolete. Were it otherwise, there would be no meaningful distinction between heavy hauling and non-size and weight spheres of transport. Thus, although it is likely that, because of the cost and manpower savings which accrue from present-day loading and unloading

procedures, suitable protective bands will not be designed for the questioned bombs, this in no way detracts from our finding that such commodities are capable as a practical matter of being loaded and unloaded through the conventional process of hand rolling.

"Turning finally to the field of service implications of the controversy, we think that such implications operate strongly to the detriment of the size and weight carriers. The status of munitions transport as a separate and unique sphere of motor carrier endeavor is well established and requires no discussion at this point. Moreover, the earlier model 500- and 750-pound bombs have already been found to be traffic peculiarly within that unique field of service.[36] Despite some

36. See the prior report, 108 M.C.C. 275 at 294.

differences, the currently produced 500- and 750-pound bombs bear far closer resemblance to their predecessors than to the jet thrust units or other motor and machine-like objects which have been placed within the limited exception to the *International* presumption.[37] It is

37. See, for example, Baggett Transp. Co., Extension-Redstone Arsenal, 88 M.C.C. 3 (1961) which recognized the heavy-hauler's right to transport 8,000-pound jet thrust units.

our view that the foregoing field of service factors, considered conjunctively with (a) the manual rolling of 500- and 750-pound bombs prior to 1966, (b) the lack of convincing evidence to show that palletization of the current models of those commodities is required by their inherent nature, and (c) the conflicting expressions of opinion as to whether the newer model bombs could be wrapped or coated in the manner to permit their being physically handled, clearly require the placing of the questioned carriage outside the pale of heavy-hauler service.[38]

38. This finding is to be contrasted with the conclusions in the *Aero* court case, *supra*. There, the court condemned a finding which placed aluminum ingots outside the size and weight perimeter

solely on the bare physical possibility that such objects could be manually handled as single units. In reaching its conclusions the court noted that 'to adopt such a conclusion in face of all the evidence to the contrary and based solely upon a conclusion that it is possible to handle these items individually, seems to us as reliance solely on a presumption, in face of uncontradicted evidence showing a sound basis for concluding to the contrary.' It is plain from our discussion that in this proceeding the testimony which seems to indicate that manual handling of the present model 500- and 750-pound bombs is physically impossible is far from uncontradicted. Accordingly, our conclusions in this report are not even remotely at odds with those expressed in the *Aero* court decision.

We conclude, as did the prior report and the examiner on further hearing, that International's participation in the transportation of 500- and 750-pound bombs is not authorized by its pertinent heavy-hauling certificates, and that respondent should be ordered to cease and desist from such transportation unless and until appropriate authority is obtained."

## Scope of Review

■ On a review of the findings and order of the Interstate Commerce Commission the question before the reviewing court is generally stated to be whether the findings and order are arbitrary, capricious, or unsupported by substantial evidence. Accelerated Transport-Pony Express, Inc. v. United States, 227 F.Supp. 815 (D.C.Vt.), affirmed 379 U.S. 4, 85 S.Ct. 43, 13 L.Ed.2d 21 (1964); Consolo v. Federal Maritime Com., 383 U.S. 607, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966); Interstate Commerce Commission v. Louisville & Nashville Railroad Company, 227 U.S. 88, 33 S.Ct. 185, 57 L.Ed. 431. In Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 415, 91 S.Ct. 814, 26 L.Ed.2d 136 (1971) the Supreme Court made it clear that agency decisions must be subject to "thorough, probing in depth review." The Administrative Procedure Act, 5 U.S.C. § 706, re-

quires a reviewing court to "decide all relevant questions of law" and to "determine the meaning or applicability of the terms of an agency action." In this review we undertake to fully comply with our review duties.

■ In reviewing an Administrative Agency's interpretation of one of its issued certificates, generally, the reviewing court is bound by the Commission's interpretation of its own certificate unless it is clearly erroneous or insufficiently supported in the record. Andrew G. Nelson, Inc. v. United States, 355 U.S. 554, 78 S.Ct. 496, 2 L.Ed.2d 484 (1958); W. J. Dillner Transfer Co. v. Interstate Commerce Commission, 193 F.Supp. 823 (W.D.Penn.1961), affirmed 368 U.S. 6, 82 S.Ct. 16, 7 L.Ed.2d 16 (1962); J. B. Acton, Inc. v. United States, 221 F.Supp. 174 (W.D.Mo.1963). And this because the Commission has an informed and time-tested expertise of its own sharpened by experience, and is the natural one to interpret the particular certificate since it was responsible for its issuance in the first place. The Commission is, of course, free to draw upon its own accumulated experience to assist it in reaching a decision. See, National Labor Relations Board v. Seven-Up Co., 344 U.S. 344, 349, 73 S.Ct. 287, 290, 97 L.Ed. 377; Daily Express, Inc.—Investigation of Operations, 98 M.C.C. 611, 670 (1967).

■ We have carefully examined the evidence in this case. To treat it in detail would serve no purpose other than to unnecessarily lengthen this opinion. We are firmly convinced that all of the findings of fact made by the Commission in its second order (which also reaffirms its first order) are fully supported by substantial and credible evidence in the record and are not arbitrary or capricious. These findings clearly are based on substantial evidence and are not dependent on a presumption.[19] It is, of course, the function of the Commission

19. The Commission's report of October 26, 1971 MC–C–5766 details much of the evidence and amply demonstrates that the Commission's findings are premised on substantial and credible evidence rather than being dependent on any presumption as such.

and not the courts to pass on the weight and credibility of the evidence. Alabama Highway Express, Inc., v. United States, 241 F.Supp. 290 (N.D.Ala.1965), affirmed 382 U.S. 106, 86 S.Ct. 255, 15 L.Ed.2d 190 (1966).

### The So-Called Dillner Presumption

Although it is clear to us on this review that the Commission's orders are based on substantial evidence persuasive to the Commission rather than being the product of a factually unsupported "presumption" that class A and B explosives are outside of heavy-hauler authority, we nonetheless believe it advisable to address ourselves to the contention that the so-called Dillner presumption as used in this case improperly changed the burden of proof to respondent heavy-haulers contrary to the Administrative Procedure Act and in violation of constitutional due process.

The history of the "Dillner presumption" is illuminating on the question. Earlier cases as well as the present one reflect deep concern on the part of the Commission over what it considered to be attempts by the heavy haulers to expand their transportation services, either by reason of modern loading practices, or otherwise, to commodities beyond those traditionally and historically within their certificated authority. In Dillner the Commission expressed it thusly:

> "Neither custom, usage, nor modern loading and shipping practices have established this commodity (fire brick) in the heavy hauling category, and although we recognize that heavy haulers should retain their customary traffic despite modern shipper practices which result in such heavy haulers' performing nothing more than bare over the road transportation with ordinary flat-bed equipment, *we must be alert to keep them reasonably within their recognized sphere unless and until they have established the right to depart therefrom on the basis of authority acquired therefor on a showing of a public need as required by Part II of the Act.*" (Emphasis added.)

One factor giving special concern to the Commission was the trend toward palletizing. It was apparent that even such light things as feathers, pencils or small arms ammunition could readily be aggregated through palletization so as to become very heavy, and presumptively require the use of special equipment to load or unload. To permit palletization to determine who had the right to haul the items, to the Commission appeared as a very serious threat to and very disruptive of its entire transportation structure. To meet this situation in Dillner the Commission applied a general rule, or presumption, as follows:

> "In bundling, aggregating, or palletizing, it should be the general rule of construction (1) that the individual 'commodity itself' is the controlling consideration as respects a carrier's authority; (2) that the limited exception which the Black case (R.Q. Black —Investigation of Operations, 64 MCC 443) represents, where commodities are bundled for protection or as otherwise required by their 'inherent nature' must be maintained within its strictest limits; (3) that the minimum bundle which is required by the 'inherent nature' of the commodity is the size or type of bundle which must be considered in any determination whether necessity exists for the use of special equipment; and (4) that in order reasonably to maintain these limits it shall be presumed, in the absence of a sound basis for concluding to the contrary, that commodities tendered to carriers, in bundles or aggregations, are within the general rule and not within the limited exception thereto."

In Parkhill Truck Company petition for interpretation No. MC–106497, 1967 FCC § 36,104 (1967), again confronted with what it considered to be claims by heavy-haulers concerning commodities considered traditionally beyond the purview of size and weight authority, the Commission said:

> "Such commodities have traditionally been considered as being outside the specialized scope of the heavy hauler.

We think this is a logical concept and we are unable to justify the transportation of this commodity under heavy hauler authority, regardless of the manner in which it is shipped . . . . *This transportation is simply not within the area of specialized operations normally performed by heavy haulers . . . .*" (Emphasis added.)

And, in Hughes Transportation, Inc., Extension, 107 M.C.C. 207 (1969) the Commission added: "Moreover, the *Moss* decision clearly does not authorize the incursions by heavy haulers *into numerous specialized fields as chemical and explosives transportation . . . .*" (Italics added).

The Commission's statement on the subject in the present report further illuminates the creation of the so-called Dillner presumption:

" . . . Due significance and effect must be accorded the traditions and precedents which have established explosives transportation as one of the most distinctive and unique sphere of motor carriage within our jurisdiction as well as the explicit refusal in *Moss* to sanction, through the medium of present day handling techniques, substantial heavy hauler incursions into totally new fields of service. Moreover, the narrow construction historically placed upon heavy hauler authority with respect to commodities within the other provinces of motor carriage excluded from general freight certificates, such as bulk and household goods carriage, lends added support to a comparative strict view as regards the areas of overlap between 'size and weight' and explosives transportation."

The Commission made it clear that when heavy-haulers entered a field of commodities served by another class of special haulers, the "presumption" established in the *Dillner* case carried over not only to aggregated and palletized commodities, but to individually shipped commodities as well. In the field of explosives transportation, the Commission stated:

"Specifically, we conclude that, when considered in light of *Moss* and *Dillner*, the relevant historical factors outlined herein, including the long-standing exclusion from general-commodity authority of classes A and B explosives as well as of heavy hauler traffic, the uniform imposition since 1955 of specific and reasonably implicit grants of explosives authority of the five-year limitation, the absence of such a limitation from heavy hauler certificates, and the lack of substantial heavy hauler interest until very recently in explosives carriage, although not sufficient to render the two areas mutually exclusive, are of such force as to create a presumption that a commodity purview of 'size and weight' authority, and to place squarely upon the heavy hauler who proposes to transport such an article, the burden of providing a sound basis for a contrary conclusion. The foregoing represents in essence nothing more than the Dillner presumption, strengthened somewhat by the unique circumstances which pervade the field of explosives transport and extended, by the force of such considerations, to individually shipped, as well as palletized, consignments of such commodities."

The showing which the size and weight carriers must make in order to rebut the foregoing presumption was described by the Commission in the present (International) case as follows:

"In view of the wide range of diverse commodities described as classes A and B explosives, the showing necessary to remove an article *from the general rule* will vary materially from case to case. Certainly, consideration will be given, as in the usual proceeding involving the scope of heavy-hauler rights, to such matters as the item's basic characteristics and the past and present methods employed in its handling. It goes without saying also that a prior finding based on an evidentiary record as to the same or an analogous commodity will be entitled to great weight. * * * Moreover, the

heavy haulers' burden is apt to be somewhat less when the commodity at issue is a motor-or-machine-like object or relatively recent invention [rocket motors or jet thrust units] than when the controversy involves an item of a type which over a long period has been considered as peculiarly within the specialized province of the explosives carriers. Obviously, the problem before us is not one susceptible to solution through the adoption of hard and fast rules. We do, however, think it safe to say that in order to establish a class A or B explosive as within the domain of the heavy-hauler, tradition and precedent require something more than a showing, for example, that aggregation or palletization represents industry practice; that these techniques constitute the most efficient, economical, and expeditious means of handling; that technological developments have rendered the use of hand labor obsolete; or, in the case of individually shipped articles, that the object is not susceptible to manual lifting by the celebrated '97-pound weakling'." [7]

"[7]. 108 M.C.C. at 292–293.

The development shown above has been continued by the Commission even after *International*. The Commission decided Doran Hauling and Rigging Co. Investigation of Operations, 105 M.C.C. 801, 1969 FCC, § 36,310 (1969). There the Commission again enunciated the ideas expressed in *International*:

" . . . the pertinent decision of history makes clear that until very recently the conflicts between the size and weight and ordinary common carriers have involved for the most part certain reasonably well defined groups of commodities among which are iron and steel articles, building and contractors' materials, motor vehicles, machinery, and motorlike objects. On the other hand, there appears to have been little, if any, manifestation prior to *Moss* of heavy-hauler entrance in such commodity classifications as packing-

house products, foodstuffs generally, lumber and forest products, furniture, paper products, clothing or cloth products, and this has been the case as to both aggregated and single-item shipments.

"*Moreover, heavy hauler attempts at entry into the other specialized areas normally excluded from general-freight certificates have as a general rule been regarded in an unfavorable light.* Thus, irrespective of a given consignment's size or weight, we have found heavy-haulers' rights generally not to authorize the carriage of dry fungibles and liquid bulk commodities when they 'assume proportions only by reason of the container or conveyance in which they are placed;' while Neptune Storage, Inc. Extension—X-Ray Machines, 88 M.C.C. 25, rejected heavy hauler claims of right with respect to X-ray machines which, although they ranged in weight from 300 to 3,500 pounds, were deemed to be within the particular domain of the household goods carriers."

The Commission then summarized the guidelines laid down in the various decisions as follows:

"The said guidelines, *all of which, by way of emphasis, have been developed in prior cases,* may be described as follows: (1) the basic characteristics, if any, of the commodity which occasion the use of special equipment; (2) prevailing industry practice with regard to its handling; (3) the manner in which it or analogous commodities have historically been shipped; and (4) its traditional sphere of carriage." (Emphasis added.)

The Commission went on to say:

" . . . we believe that, as regards commodities within the specialized operational spheres customarily excluded from general-commodity certificates, the principles which were enunciated, as to classes A and B explosives, in specific terms in the *International Investigation* case and which underlie by implication the *Neptune* and *Ashworth* decisions, supra, as to

household goods and bulk commodities, respectively, are sound and should be affirmed. Specifically, commodities properly so classified are in effect presumed, irrespective of whether they are shipped individually or in aggregated form to be beyond the field of heavy-hauling service, and here again the size and weight carrier who proposes to engage in such transportation assumes the burden of developing a record such as will support a valid conclusion to the contrary. As we observed in the *International Investigation* case, *these rules of construction* represent in essence 'the Dillner presumption strengthened somewhat by the unique circumstances which pervade the field . . . and extended, by force of such considerations, to individually shipped, as well as palletized, consignments of such commodities.' 108 MCC at 292. And, in order to assure that all of the foregoing is given maximum intended effect, we hereby remind the parties that heavy-hauler rights in the involved fields of transportation *represent exceptions to a general rule* and, as such, are to be strictly construed." (Emphasis added.)

■ Summarizing, in Dillner the Commission took into consideration its own prior decisions and the history (facts) they revealed concerning the transportation field and its carrier classifications and certificated authority, and especially the history of explosive motor transportation. It paid particular attention to the evidence of the rapid growth of the modern practice of aggregating or palletizing of items and the resultant problems created concerning what class or classes of carriers were authorized to transport such aggregated or palletized commodities. Acting on the basis of that history, data and facts which it could properly consider in the exercise of its expertise to regulate the motor carrier industry as charged by Congress, the Commission expressed a general rule (decisional) concerning the interpretation of its certificates as they might relate to the transportation of palletized explosives. First noting that traditionally and normally such explosives have been considered outside the scope of heavy-hauler authority, the Commission declared that as a general rule in interpreting its certificate it would presume such aggregated or palletized explosives to be outside the scope of heavy-hauler certificated authority and would place the burden on the heavy-hauler to produce evidence to overcome the presumption—i. e., to show it came within an exception to the general rule.[20] In the instant case faced with what it believed was an attempted further incursion by heavy-haulers into the field of explosives transportation, and to maintain the integrity of its various classifications it broadened the general rule or presumption to include class A and B explosives, not only in aggregated or palletized states, but as individually shipped also. In formulating such a presumption or general rule as an aid in interpreting its certificates and in recognizing that there are limited exceptions to the general rule, the Commission endeavored to carefully set out the rational basis in fact that it deemed it had as the basis for its action. While the Commission used both the term "presumption" and "general rule" it obviously preferred to postulate the matter in terms of a limited and rebuttable presumption.[21] In taking this approach the Interstate Commerce Commission has

**20.** It is noteworthy that Section 7(c) of the Administrative Procedure Act, 5 U. S.C. §§ 1006(c), 556(d) which reads: "Except as statutes otherwise provide, the proponent of a rule or order shall have the burden of proof" received the following legislative comment: "That the proponent of a rule or order has the burden of proof means not only that the party initiating the proceeding has the general burden of coming forward with a prima facie case but that other parties who are proponents of some different result, also for that purpose have a burden to maintain." Senate Document No. 245, 79th Congress, 2nd Session 208, 270 (1946).

**21.** Where facts are shown which give rise to a presumption, the ordinary function of the presumption is to constitute prima

done no more than was done, with approval, by the National Labor Relations Board in Republic Aviation Corp. v. N.L.R.B., 324 U.S. 793, 65 S.Ct. 982, 988, 89 L.Ed. 1372, 1380 (1945). As there stated by Mr. Justice Reed in behalf of the Court, "Like a statutory presumption, or one established by regulation, the validity, perhaps in a varying degree, depends upon the rationality between what is proved and what is inferred.[22]

In the instant case the history, facts, and data before the Commission in our judgment provided a rational basis for it in the exercise of its expertise to recognize and apply as it did the general rule or rebuttable presumption here under attack. The presumption was not created out of thin air. Nor did it shift the ultimate burden of proof in the case. The Enforcement Branch of the Commission, and others, adduced substantial and sufficient evidence to provide a basis for the commission to find, as it did, that its certificate granted to International did not include authority to haul 500 and 750 pounds bombs.[23]

Since International's certificate of convenience and necessity has been properly found not to contain authority to haul the mentioned bombs, nothing has been taken from International that it ever possessed. Because nothing was taken from International that it had ever possessed by virtue of its certificate, there has been no violation of 49 U.S.C. § 312(a) establishing the method that must be used if a carrier's certificated authority is to be lessened. Nor has International been deprived of due process of law, for, as we view the issues, the Commission has not changed or narrowed International's certificate under the guise of interpretation to deprive it of something it once had.[24] The facts before us and before the Commission fail to show that there has been a partial revocation of International's certificate. It is not contrary to law for the Commission to interpret its certificates in the manner it has used in this case.

Finally, we come to the request of some of the parties that this case be remanded again to the Commission for it to "properly formulate its regulatory policy"[25] and to better articulate the standards and principles that govern its

---

facie proof as to the issue involved and to shift to the other party the burden of going forward with the evidence as to that issue. See, Webre Steib Co. v. Commissioner of Internal Revenue, 324 U.S. 164, 65 S.Ct. 578, 89 L.Ed. 819 (1944).

22. And compare N.L.R.B. v. Mastro Plastics Corporation (2nd C.A. 1965) 354 F.2d 170, concerning a general presumption of job availability against the employer was cast in terms of a Commission declared affirmative defense thrusting the burden of going forward with the evidence on the employer.

23. For a recent decision illustrating the very difficult classification problems the Commission must resolve and the history involved in their resolution, see Ace Doran Hauling and Rigging Co.—Investigation, 105 M.C.C. 801, 1969 F.C.C. # 36, 310 (1969).

24. See, Brady Transfer & Storage v. United States, 80 F.Supp. 110, (S.D.Iowa 1948) affirmed per curiam, 355 U.S. 875, 69 S.Ct. 239, 93 L.Ed. 418.

25. The United States is properly concerned that the practical impact of *International* not adversely affect its ability to obtain munitions. On this point the Commission in *International* has answered as follows:

"It must, however, be kept in mind that the munitions carriers have been obliged in the interests of public protection to maintain special transportation facilities and to observe safety requirements over and above those placed on other carriers, including the heavy haulers.[40] The investment required to meet such obligations is large and the need to promote and encourage those essential expenditures require, in our opinion, a close scrutiny of all applications for new authority to transport classes A and B explosives so as to assure that entry into the field is limited to those instances where a clear need for additional service by a qualified carrier is shown.[41]

"Finally we wish to dispel once and for all any notion that our conclusions in this report will require the military or other munitions shippers to forego the use of modern handling procedures in the loading

decision and order.[26] One intervenor asserts the Commission's order "dictates new, impractical, unclear and imprecise rules of interpretation". To better appreciate the difficulties confronting the Commission in endeavoring to formulate and articulate controlling standards and principles that are reasonably free of complexity it is helpful to read and ponder the intricate, multitudinous, highly complex and somewhat overlapping considerations that seem inescapably to be inherent in the classification of commodities for purposes of hauler authority as discussed in Ace Doran Hauling & Rigging Co., Investigation, 108 M.C.C. 717 (1969), and its cited decisions. The need for valid and experienced expertise in the motor carrier field is all too plain. This, Congress undertook to supply in the commodity carrier field through the establishment of the Interstate Commerce Commission. To that agency is committed by law the duty to regulate in the public interest.[27] While we wish the Commission had some simple nondebatable standards that would clearly and instantly answer every matter presented to it, such is not the case. No more we might say, that it is the case when Congress and the Courts, for example, undertake to define such a seemingly simple term as "capital gains" in income tax matters.[28]

The present case has been either in the Courts or in the Commission for nearly five years. It has been twice heard in each place. Meanwhile, a number of carriers who are awaiting the outcome of this decision are suffering a sub-stantial, irreparable financial loss, for there is no remedy available to them to collect for their business losses suffered through the wrongful incursion of other carriers into their certificated hauling area. More to the point is our conviction that to again remand carries no assurance that any new and simplified standards would or could result in this highly complex area. We accept the Commission's presently announced and applied standards, principles, and criterion before us on this review to be sufficient in substance, rationale and in articulation to withstand the charge that they do not provide reasoned decision making comporting with due process and with the legislative intent expressed in the applicable statutes.

We affirm the Commission's reports, and we order enforcement of the Commission's injunctive order issued in connection with its reports and decision herein dated October 26, 1971. We set as the date for that order to become effective, January 28, 1972, at 12:00 noon.

FLOYD R. GIBSON
_____
Circuit Judge

WILLIAM R. COLLINSON
_____
District Judge

ELMO B. HUNTER
_____
District Judge
Judge, Three-Judge Court

ELMO B. HUNTER
_____
District Judge
Judge, Single-Judge Court

or unloading of classes A and B explosives and to rely instead on less efficient, though formerly acceptable, techniques."

\*   \*   \*   \*   \*

"In passing, we might point out that the use—as clearly demonstrated on the record before us—of automated handling devices in connection with bomb shipments transported by non-size and weight carriers should be sufficient in and of itself to allay any fears which may remain as to the practical impact of our decision in this proceeding upon the adequacy of service that may be available to the military establishment for this transportation."

26. The Administrative Procedure Act requires the agency to include in its decision "its findings or conclusions as well as the reason or basis therefor." 5 U.S.C. § 1007, § 8(b).

27. Board of Trade v. United States, 314 U.S. 534, 546, 62 S.Ct. 366, 86 L.Ed. 432; cf. United States v. Detroit & Cleveland Nav. Co., 326 U.S. 236, 241, 66 S.Ct. 75, 90 L.Ed. 38.

28. See, for example, C.I.R. v. Ferrer, 304 F.2d 125, 129 (2 Cir. 1962); Commissioner of Internal Revenue v. Gillette Motor Transport, 364 U.S. 130, 80 S.Ct. 1497, 4 L.Ed.2d 1617, 1621 (1960).