**TRI–STATE MOTOR TRANSIT COMPANY et al., Plaintiffs,**

**Interstate Commerce Commission, Intervening Plaintiff,**

v.

**INTERNATIONAL TRANSPORT, INC., Defendant.**

**No. 2054.**

United States District Court,
W. D. Missouri,
Southwestern Division.

April 24, 1972.

Lawrence R. Brown and Lawrence M. Berkowitz, Kansas City, Mo., for plaintiffs.

Harry F. Horak, I. C. C., Ft. Worth, Tex., John L. Kapnistos, Kansas City, Mo., for intervening plaintiff.

Byron J. Beck, Kansas City, Mo., William K. Johnson, Chicago, Ill., for defendant.

## FINDINGS, ORDER AND OPINION

ELMO B. HUNTER, District Judge.

This is a proceeding for an injunction under 49 U.S.C. § 322(b) (2), the so-called "self help" statute which provides that if any person operates in clear and patent violation of any provisions of the Interstate Commerce Commission Act or any rule, regulation or order of that Commission any person injured may apply to the district court of any district where the violator operates for enforcement of the law, rule, regulation or order. The statute also provides for allowance in the Court's discretion of reasonable attorney fees to the prevailing party.

The four plaintiffs are each common carriers by motor vehicle to whom certificates of convenience and necessity have been issued by the Interstate Commerce Commission authorizing plaintiffs to transport, among other things, Class A and Class B explosives over certain prescribed routes in interstate commerce. The Interstate Commerce Commission as of June, 1969, has appeared as an intervening plaintiff.

Defendant, International Transport, Inc., (International) a North Dakota corporation, is a common carrier by motor vehicle to whom certificates of convenience and necessity have been issued by the Interstate Commerce Commission authorizing International to transport,

among other items, commodities, the transportation of which, by reason of size or weight, requires the use of special equipment or special handling, over certain prescribed routes in interstate commerce. In the exercise of its authority International at all relevant times has operated in the Western District of Missouri. The various routes over which International transported the goods in controversy are competitive, in whole or in part, with routes over which plaintiffs hold operating authority to transport such commodities.

### Background of the Litigation

Commencing on May 17, 1967, and continuing to and including June 11, 1971, International transported in interstate commerce 500-pound bombs and 750-pound bombs containing Class A or Class B explosives. International also transported in interstate commerce after the filing of the instant complaint at least two truckloads of palletized ammunition for cannon having an apparent unit weight, unboxed and unpalletized, of less than 150 pounds, much of which weighed 29 pounds or 39 pounds to the box. All mentioned transportation was performed for the Department of Defense.

Prior to commencing the above described transportation, International filed with the Interstate Commerce Commission a tender or rate quotation, which was issued April 13, 1967, and effective April 15, 1967. By such document International held itself out to the public including the Department of Defense to transport all items described therein at the rates set out.[1] Included in the tender is a wide range of ammu-

nition and bombs (Class A and B explosives) with no limitation as to weight.

On June 14, 1967, plaintiffs filed their complaint seeking to enjoin, among other items, the transportation in interstate commerce of the mentioned 500 and 750-pound bombs and ammunition for cannon.

On June 30, 1967, as the result of an evidentiary hearing on June 29, 1967, the undersigned court upon findings made issued a preliminary injunction enjoining International from further transportation of the cannon ammunition of an individual weight of 150 pounds or less. Particularly, the Court found that International lacked certificated authority to haul such ammunition and that its hauling of it was a clear and patent violation under Title 49 U.S.C. § 322(b)(2). At the same time and to avail itself of the expertise of the Interstate Commerce Commission the Court in effect referred to the Interstate Commerce Commission the question of whether International was authorized to haul 500 and 750-pound bombs of the type and description it was hauling.[2] Meanwhile, International continued to haul such bombs.[3]

The referenced matter remained before the Interstate Commerce Commission for approximately two years, during which period after extensive hearings it twice decided and ruled by administrative order that heavy-hauler authority, including that possessed by International did not authorize the transportation of the mentioned 500 and 750-pound bombs, and that their transportation by International was illegal. See International Transport, Inc., Investigation, No. MC–C 5766, 108 M.C.C. 275, decided December 31, 1968, and ibid,

---

[1.] The tender did also contain the following: "Rates and provisions named in this tender, or as amended, are limited in their application on interstate or foreign commerce to the extent of the operating rights set forth below: 'And then set out its various certificates of hauling authority.' "

[2.] See Leonard Brothers Trucking Co. v. United States, 301 F.Supp. 893 (S.D. Fla.1969).

[3.] Later testimony reveals defendant continued to haul 500 and 750-pound bombs until June 11, 1971, at which time it ceased because it was economically unsound to continue at the current rates that had dropped drastically.

MC–C 5766, decided October 26, 1971. The administrative order was affirmed by the United States District Court for the Western District of Missouri in a three-judge proceeding. See, International Transport, Inc. v. United States, D.C., 337 F.Supp. 985.

On February 14, 1972, a full and final evidentiary hearing was held in the instant case. In order to expedite final disposition of this cause the parties, with the Court's approval, limited the commodities to be considered to ammunitions weighing less than 150 pounds per individual item and to bombs of approximately 500 and 750 pounds.

As a result of that hearing and the earlier hearing it is clear that International prior to May 17, 1967, had never attempted to haul Class A or Class B explosives, nor had any other heavy-hauler insofar as is known to any of the parties. Perhaps encouraged by the *Moss* decision,[4] and by the profits attainable, on May 17, 1967, it energetically[5] entered the hauling of Class A and B explosives field as earlier described. By its mentioned tender it held itself out as willing to haul all of the commodities listed in it. These items, as earlier noted, included a wide range of ammunitions and bombs, with no limitation as to weight. Some of the smaller items actually hauled included 29 and 39-pound shells, palletized; cartridges, grenades, and percussion caps, also palletized.[6]

It was International's position that the weight and size of the individual item or boxed item was not controlling as to its right to transport the item but that it was the size and weight of the items as palletized that controlled such right.[7] International clearly was not limiting its asserted right to transport palletized items to those situations where by the *inherent nature of the items palletization is required*. Differently stated, International's position was that if the shipper for economic reasons or for reasons of efficiency or convenience to it tendered the items in palletized form the right of International to transport was governed by the size and weight of the palletized group of items regardless of whether the inherent nature of the items to be shipped required palletization.

### The Question of Jurisdiction

It is conceded by the parties that the Court has personal jurisdiction of the parties and jurisdiction of controversies under 49 U.S.C. § 322(b) (2). However, International contends *jurisdiction to grant relief* under 49 U.S.C. § 322(b) (2) is conferred only in those cases where the defendant operates "in clear and patent violation" of certain specified sections of statute, or of any lawful rules or regulations issued pursuant thereto, and that there is no credible evidence to show a clear and patent violation. Hence, International asserts this Court is without jurisdictional authority to grant injunctive relief and to award attorneys' fees.

### (a) Background of Section 322(b) (2)

Some of the background reasons for the enactment by Congress of Section 322(b) (2) are apparent. Originally, Congress by its statutory scheme had

---

4. *Moss Trucking Co., Inc., Investigation of Operations*, 103 M.C.C. 91 (1966).

5. From its first hauling on May 16, 1967, to the first hearing on June 28, 1967, International had transported 111 truckloads of explosives, including two boxes of cannon shells. It received approximately $300,000 for handling these shipments of which approximately 20 percent was profit.

6. Concededly, the inherent nature of those items did not require palletization. As palletized, they weighed as much as 2,000 pounds per palletized unit.

7. For example, in its counsel's letter of June 29, 1967, to this Court it is stated: "The Moss rule really is that if a commodity is palletized for a sensible commercial reason of the shipper, under present day realities, the Interstate Commerce Commission is not going to stop a size and weight carrier from transporting it." The early briefs of International reveal the same attitude.

charged the Interstate Commerce Commission with the responsibility of administering the interstate motor carrier field. Congress was aware that no private right to damages existed on the part of any motor carrier who was damaged by another carrier's unlawful incursion into the business of the first carrier by operations of a competitive nature beyond its certificated authority. See, McFaddin Express, Inc., v. Adley Corporation, 363 F.2d 546, cert. denied 385 U.S. 900, 87 S.Ct. 206, 17 L.Ed.2d 132 (2nd Cir. 1966). Congress recognized that in the public interest motor carriers who were aggrieved by a motor carrier's operation in excess of its certificated authority should be empowered to go into a federal district court and enjoin such excess operations where the particular operation is a clear and patent violation.[8] Yet Congress did not want the federal district courts to intrude so as to possibly interfere with the Interstate Commerce Commission's regulatory scheme, absent the safeguard of a clear and patent violation situation. To further prevent possibility of undesired interference, Congress granted statutory authority to the Interstate Commerce Commission to stop any federal district court from proceeding in a case until the Commission had opportunity to resolve the matter. As stated in Baggett Transportation Co. v. Hughes Transportation, Inc., 393 F.2d 710 (8 Cir. 1968), in discussing § 322(b) (2), "Not only is a remedy provided therein, the words 'clear and patent' are judiciously used to indicate jurisdiction separate and apart from the ICC's primary jurisdiction." Thus the House Report notes that, " * * * the words 'clear and patent' are used and are intended as a standard of jurisdiction rather than as a measure of the required burden of proof." 1965 U.S.Code Cong. & Admin. News, Vol. 2, at p. 2931. In order to regain primary jurisdiction of the controversy and also to prevent the use of § 322(b) (2) to harass carriers legitimately operating, the I.C.C. may take jurisdiction of the matter under § 322(b) (3) and stay further action in the District Court."

### (b) The Existence of Jurisdiction Under § 322(b) (2)

Jurisdiction exists in the district court in the instant case. The verified complaint charges a clear and patent violation. It was clearly established on April 10, 1959, in W. J. Dillner Transfer Co., Investigations of Operations, 79 M. C.C. 335, that a heavy-hauler could not successfully base his right to transport on the size and weight of the items in palletized form unless the items were such that palletization was inherently required or necessitated. The supporting evidence as early as the June 28, 1967, hearing on the preliminary injunction disclosed a clear and patent violation in the hauling by International of the palletized 29 and 39-pound boxed shells, and other ammunition which was comparatively light in weight and none of which inherently required palletization.[9] The evidence in the case

---

8. In Baggett Transportation Company v. Hughes Transportation, Inc. and I.C.C., 393 F.2d 710 (8 Cir. 1968) it is stated:

    The Congressional concern with eliminating delay which prevents innocent parties from securing prompt and effective protection was manifest in the 1965 amendment. Thus, in discussing the amendment increasing the civil penalties, the House Report appropriately notes that: "Under existing law, procedures for dealing with certain motor carrier violations are often slow and cumbersome, and frequently ineffective." 1965 U.S.Code Cong. & Adm.News, Vol.

2, at 2929. Certainly one way of securing prompt and effective protection for innocent persons injured by the clearly illegal operations of other carriers is to give the injured persons the right to apply for injunctive relief independently of any Commission proceedings. § 322(b) (2) accomplishes this by allowing injured persons to enjoin "clear and patent" violations.

9. The parties and the Court have treated the issues as continuing to the date of trial and have allowed discovery as to what was being transported in the last six months

also discloses a clear and patent violation as regards the transportation of the 500 and 750-pound bombs, as will later be discussed.

■ Nor did the referencing to the Interstate Commerce Commission of the question concerning the 500 and 750-pound bombs and the withholding of decision on that issue until the Interstate Commerce Commission had first decided it deprive this Court of jurisdiction to decide the clear and patent question as to those items. As stated in Leonard Brothers Trucking Co. v. United States, 301 F.Supp. 893, 898 n. 7, (S.D.Fla. 1969), "As is normally the case with reference to the doctrine of primary jurisdiction, 'Court jurisdiction is not thereby ousted, but is only postponed.' United States v. Philadelphia Nat'l Bank, 1963, 374 U.S. 321, 353, 83 S.Ct. 1715, 1737, 10 L.Ed.2d 915." It is entirely within the Congressional intent as expressed in the legislative history of § 322(b) (2) of 49 U.S.C. for the district court to avoid possible interference with the Interstate Commerce Commission by availing itself of that Commission's expertise under the primary jurisdiction doctrine prior to the district court's deciding the "clear and patent" issue.

A district court under a stay order or in a referred proceeding may be aided by the rulings or decisions of the Commission. See Munitions Carriers Conference, Inc., v. American Farm Lines, 415 F.2d 747, 749 (10 Cir. 1969). The referencing or abstaining court is not to be penalized for having resorted to the primary jurisdiction doctrine by directly or indirectly referencing a question to the Interstate Commerce Commission. Such a referencing should not be construed as tantamount to a holding by the court that the transportation in question is not a clear and patent violation.

■ Referrals under § 1336(b) of Title 28 U.S.C. are to be encouraged as a part of the overall statutory scheme of motor carrier regulation which basically looks to the Interstate Commerce Commission for primary regulation. All that is required is that at the time of the district court decision the evidence before the district court support and the court find the statutorily required clear and patent violation charged in the complaint.

### The Question of Clear and Patent Violation

#### (a) With regard to the 500 and 750-pound bombs

■ It is the Court's finding that International's hauling of the 500 and 750-pound bombs was a transportation of such items in interstate commerce in clear and patent violation of the Commission's regulations and orders in that such items clearly and patently were not within International's certificated authority. In so finding, this Court adopts the reasoning, criteria and guidelines for making such finding as set out in the Three-Judge review of and in the two Commissions' hearings on this same issue and hauling by International. See, International Transport, Inc., et al. v. United States of America and Interstate Commerce Commission, D.C., 337 F. Supp. 985; International Transport, Inc. —Investigation, No. MC–C 5766, 108 M. C.C. 275 and ibid. MC–C 5766. In that Three-Judge Decision it was summarized thusly: "The said guidelines, *all of which by way of emphasis, have been developed in prior cases*, may be described as follows: (1) the basic characteristics, if any, of the commodity which occasion the use of special equipment; (2) prevailing industry practice with regard to its handling; (3) the manner in which it or analogous commodities have historically been shipped, and (4) its traditional sphere of carriage."

---

of 1971. The Court considers the pleadings to be amended accordingly to conform to the proof. Also, for the same reason the Supplementary Complaint of plaintiffs is deemed filed as of February 14, 1972, to conform to the proof. See Rule 15, F.R.Civ.P.

It would serve only to prolong this opinion to detail all the evidence applicable to each of these guidelines for interpreting a certificate such as International's. The history of the manual handling of bombs of this general type, size and weight, including the rolling of them by hand both in loading them for transportation and unloading them is part of the evidence in this case.[10] The reasonable susceptibility of the individual bombs to such manual handling, both past and current, and without any need of special equipment was established. The evidence before us viewed in the light of the above adopted guidelines fully supports the finding that the transportation by International of the 500 and 750-pound bombs was and is clearly and patently outside the scope of its heavy-hauler authority and in violation of Sections 303(c) and 306 (49 U. S.C.) of the Interstate Commerce Act.

The history of munitions transportation and heavy-hauler authority is set out in considerable detail in the two Interstate Commerce Commission hearings and in the Three-Judge Court review of them and further confirms the clear and patent nature of the violation. It is apparent from such history that shortly after motor carriers came under the jurisdiction of the Interstate Commerce Commission, it developed a system of classifying and identifying carriers, among other ways, by the type of commodity carried. See, Classifications Case 2 M.C.C. 703 (1937). Some seventeen specific classifications were declared, and classification No. 16 was "carriers of explosives or dangerous articles." It is reasonably clear that at that time no other existing motor carrier classification authorized, encompassed or contemplated the transportation of explosives. Certainly what are now known as heavy-haulers did not possess authority to transport explosives. See, Classifications Case, 2 M.C.C. 703, 710.

By what can be best described as an evolutionary process heavy-hauler classifications came to be one described mainly by reference to the type of service performed. See, Osborne Common Carrier Application—Heavy Materials, 37 M.C. C. 633; Ace Doran Hauling and Rigging Company, Investigation of Operations, MC–C 4397 (May, 1969); Gallagher Common Carrier Application, 38 M.C.C. 413. Eventually their commodity description read, "Commodities which by reason of size or weight require the use of special equipment." This description did not include such items as bulk liquid, petroleum products, household goods or refrigerated products, regardless of their size or weight. These mentioned items and others were transported by carriers other than heavy-haulers. Nor is there any evidence to suggest that Class A and Class B explosives were included in size or weight authority. It is undisputed that until 1967 heavy haulers had not exhibited any interest in transporting Class A and Class B explosives and had not transported such explosives.

As earlier mentioned, in 1967 International, and some other heavy-haulers, commenced the hauling of Class A and Class B explosives asserting they could measure their certificated authority to haul by the size or weight of the palletized group of items involved rather than by the individual item. They read the decision of Moss Trucking Co., Inc., Investigation Operations, 103 M.C.C. 91 (1966) as supporting their position. However, the Interstate Commerce Commission interpreted Moss quite differently, and in later decisions took care to point out that palletization as such was not relevant and had never been relevant in determining whether heavy haulers could transport items, unless the inherent nature of the items required palletization. See Ace Doran Hauling and Rigging Co., Investigation of Operations, 108 M.C.C. 717 (April 16, 1969);

---

10. The transcripts of the evidence before the Interstate Commerce Commission on the subject are in evidence in this proceed-ing as well as other evidence on this subject.

Steel Haulers, Inc., Ext. Tulsa, Okla. 110 M.C.C. 612, 617–619 (1969); Parkhill Truck Company Petition for Interpretation, MC –106497 (1967); Doran Hauling and Rigging Company, Investigation of Operations, 105 M.C.C. 801 (1969); Hughes Transportation Company, Inc., Extension 107 M.C.C. 207 (1969).

In *Hughes*, supra, the Commission expressed it thusly: "Moreover, the *Moss* decision clearly does not authorize the incursions by heavy haulers into numerous specialized fields as chemical and explosives transportation."

In the face of this history and these decisions and others, of the same tenor,[11] International began and continued its hauling of the ammunition and bombs here in issue. Although the Interstate Commerce Commission specifically ruled on December 31, 1968, that International did not possess authority to transport 500 and 750-pound bombs,[12] International took the risk that it could upset the decision, deemed it as not final, and continued its transportation of these items until June 11, 1971, when it ceased hauling for economic reasons but

---

11. For example, in W. J. Dillner Transfer Co., Investigation of Operations, 79 M.C.C. 335, decided April 10, 1959, in describing the principles of construing a certificate the Commission summarized as follows:

"(3) In bundling, aggregating, or palletizing, it should be the general rule of construction (1) that the individual 'commodity itself' is the controlling consideration as respects a carrier's authority; (2) that the limited exception which the *Black* case, 64 M.C.C. 443, represents, where commodities are bundled for protection or as otherwise required by their 'inherent nature,' must be maintained within its strictest limits; (3) that the minimum bundle which is required by the 'inherent nature' of the commodity is the size or type of bundle which must be considered in any determination whether necessity exists for the use of special equipment; and (4) that in order reasonably to maintain these limits it shall be presumed, in the absence of a sound basis for concluding to the contrary, that commodities tendered to the carrier, in bundles or aggregations, are within the general rule and not within the limited exception thereto; 79 M.C.C. at page 358.

"Thus, only under unusual circumstances may aggregation or bundling result in a situation where such commodities may thereby be recognized as requiring special equipment. This is a special exception to the long-recognized general rule which looks at 'the commodity itself,' it is in no sense applicable where bundling is done on the basis of economy and efficiency; * * * and we wish to emphasize the obvious necessity for maintaining such exception within its strictest limits. 79 M.C.C. 352.

"And in anticipation of an increased resort to palletization and other modern shipping techniques in the field of heavy-hauler service, it added at 79 M.C.C. 357:

" 'Neither custom, usage, nor modern loading and shipping practices have established this commodity [firebrick] in the heavy-hauling category, and although we recognize that heavy haulers should retain their customary traffic despite modern shipper practices which result in such heavy hauler's performing nothing more than bare over-the-road transportation with ordinary flat-bed equipment, we must be alert to keep them reasonably within their recognized sphere unless and until they have established the right to depart therefrom on the basis of authority acquired therefor on a showing of a public need as required by part II of the act.' "

"This Commission and the motor carrier industry came to rely upon the Dillner standards, and these criteria were utilized to determine the status under heavy-hauler authority of a wide scope and variety of commodities in cases too numerous to cite. Although none of the decisions involved classes A or B explosives as such, the considered rules were brought into play with respect to other commodities subject to our regulations governing the carriage of dangerous articles, such as radioactive materials."

12. See, 108 M.C.C. 275. The second ruling was on October 27, 1971. See M.C.C. 5766. International must also have known that in reviewing an administrative agency's interpretation of its own issued certificate, generally, the reviewing court is bound by the Commission's interpretation of its own certificate unless it is clearly erroneous or insufficiently supported in the record. Andrew G. Nelson, Inc. v. United States, 355 U.S. 554, 78 S.Ct. 496, 2 L.Ed.2d 484 (1958); W. J. Dillner Transfer Co. v. Interstate Commerce Commission, D.C., 193 F.Supp. 823, affirmed 368 U.S. 6, 82 S.Ct. 16, 7 L.Ed.2d 16 (1962); J. B. Acton Inc. v. United States, 221 F.Supp. 174 (W.D.Mo.1963).

did not remove those items from its outstanding tender. Regardless of what its state of mind may have been earlier, certainly International knew that unless it could upset the Commission's December 31, 1968 ruling on these very bombs,[13] it was clearly and patently violating its hauling authority as it continued to haul these items.

International is unfavorably situated to now contend the clear and patent statutory requirement has not been met both in letter and in spirit. Not only has the Interstate Commerce Commission not been interfered with by this self-help suit but on the contrary its expertise has been timely and properly sought in this very action, and followed. It is noteworthy that the Interstate Commerce Commission interceded in this action to become a party plaintiff and is urging this Court to find a clear and patent violation and to enter its injunctive order accordingly. And understandably so in the light of The Commission's ruling that "beyond question" International did not possess authority to haul the 500 and 750-pound bombs.

### (b) With regard to the palletized ammunition

It is also the Court's finding that International's hauling of the described palletized ammunition weighing 150 pounds or less as boxed but unpalletized was a transportation of such items in interstate commerce in clear and patent violation of its certificated authority which did not encompass these items. The evidence demonstrates that International was misinterpreting its certificated authority in claiming the right to

measure such authority by the size and weight of the palletized group regardless of an inherent need for the items to be palletized. As individually boxed such items had been and could be manually loaded for transportation and unloaded, and otherwise manually handled. No special equipment was required. Nor is there any evidence to show heavy-haulers had ever before hauled such items or had claimed the right to do so.[14]

### The Injunction

The decision as to whether or not to issue an injunction rests to large extent in the sound discretion of the trial court, and requires careful consideration of all salient facts as well as the applicable equitable principles. Guidance for the exercise of sound discretion is found in such cases as Farmer v. Arabian American Oil Co., 379 U.S. 227, 85 S.Ct. 411, 13 L.Ed.2d 248 (1964) and cases cited therein.

### a. With regard to the bombs

At the time of the trial on the merits held on February 14, 1972, some thirty-seven months had passed since the Interstate Commerce Commission had first held on December 31, 1968, that International was illegally transporting 500 and 750-pound bombs because it was beyond its certificated authority as a size and weight carrier. According to the testimony International continued to haul these bombs from May 17, 1967, to June 11, 1971, when because of price changes it deemed it unprofitable to do so.[15] Only then did it in fact cease to haul the bombs. Its offer in its tender to haul all explosives without lim-

---

13. The Interstate Commerce Commission's decisions have been upheld by a Three-Judge Court. See, International Transport, Inc., et al. v. United States and I.C.C., et al., D.C., 337 F.Supp. 985.

14. In Ace Doran Hauling and Rigging Co., Investigation, supra, loc. cit. 723 (decided April, 1969) in reviewing earlier cases the Commission noted: "For one thing, these cases show little in the way of heavy-hauler interest in objects which weigh less than 200 pounds, and, where

the issue did arise, manual lifting appears universally to have been considered a reasonably practical method of handling such items."

15. This Court finds that by such illegal transportation International wrongfully diverted from these plaintiffs and others substantial profit-type transportation business causing these plaintiffs to be "injured" within the meaning of 49 U.S.C. § 322(b)(2).

itation as to size, weight or inherent requirement of palletization was still outstanding at trial time, although a witness indicated that document was going to be amended that day. It appears obvious that economic factors, rather than any other consideration, were the primary reason for the cessation of transportation and, of course, the economic factors involved are variable, subject to change and do not provide any assurance that future illegal hauling will not occur. Cessation of violation, whether before or after the initiation of the suit does not bar the issuance of an injunction, nor render the case moot. Hecht Co. v. Bowles, 321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754. The Court may act on the evidence before it at the time it decides the merits of the case. Ohio Oil Co. v. Conway, 279 U.S. 813, 49 S.Ct. 256, 73 L.Ed. 972; Munitions Carriers Conference, Inc. v. American Farm Lines, supra; United States v. W. T. Grant Co., 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303; United States v. Oregon State Medical Society, 343 U.S. 326, 72 S.Ct. 690, 96 L.Ed. 978 (1951).

There is reasonable apprehension and a reasonable likelihood that the transportation may again commence any time the economic benefits appeal to International as sufficiently favorable. In such event plaintiffs are without an adequate remedy at law and would again suffer an irreparable injury. For, if a permanent injunction were denied and this action dismissed, the only form of restraint in effect as to International is the Commission's cease-and-desist order. Should International in the future violate that order, the only recourse would be for the Commission to institute a criminal action under 49 U.S.C. § 322(a) for violation of the cease and desist or-

der, or to commence its own civil injunction proceeding under 49 U.S.C. § 322(b) (1) requiring compliance with the cease and desist order. Neither alternative would be a remedy that would prevent an irreparable injury to plaintiffs or permit them to have a right to and to collect the damages they would suffer. See Munitions Carriers Conference, Inc. v. American Farm Lines, 440 F.2d 944 (10th Cir. 1971). The practicalities of the situation are such that plaintiffs cannot reasonably be protected from future illegal hauling of these bombs absent an injunction order by this Court enjoining such transporting.

### (b) With regard to the palletized ammunition

Cessation of the illegal hauling in obedience to the preliminary injunction does not bar issuance of a permanent injunction. See, United States v. Article of Drugs, etc., 362 F.2d 923, 928 (CCA 3, 1966); Pullum v. Greene, 396 F.2d 251, 256 (CCA 5, 1968); Sigma Chi Fraternity v. Regents of University of Colorado, 258 F.Supp. 515, 523. While International professes it was in good faith in its belief that it was authorized to transport these Class A and B explosives and states that it is no longer hauling them, the Court finds an injunction is required to reasonably assure against future illegal hauling of such palletized items. As indicated by the evidence in this case,[16] the temptation to haul is unusually great because of the large profits involved in times of substantial need of such explosives and the lack of a private right to damages on the part of motor carriers financially damaged by such hauling. There is a reasonable probability that the unau-

---

16. It is a time consuming and tedious route an aggrieved motor carrier must take through appropriate Interstate Commerce Commission proceedings to halt unlawful incursions into its hauling area. Meanwhile, the offending motor carrier may, without fear of financial penalty acquire huge profits—thus adding substantially to the temptation to go beyond its certificated hauling authority. In the instant case the evidence indicates International received enormous income from its illegal haulings during the approximately 4½ years involved. The evidence indicates that in its first six weeks of hauling the described bombs International received $300,000 therefrom of which approximately 20 percent was profit.

thorized transportation of such items may again occur.

▮ Where, as here, all the equitable considerations for the issuance of an injunction including irreparable injury and no adequate remedy at law have been demonstrated in evidence the injunction should issue. Petroleum Exploration, Inc. v. Public Service Commission, 304 U.S. 209, 58 S.Ct. 834, 82 L.Ed. 1294 (1938).

### The Attorney Fees Question

▮ The allowance of attorneys' fees is discretionary. 49 U.S.C. § 322(b) (2).[17] According to the credible evidence, the reasonable amount of attorneys' fees properly allowable against defendant International, if only the services in this self-help case are considered, is $10,894.37, plus $387.37 out-of-pocket necessary expenses. Plaintiffs are hereby allowed these two sums as necessary and reasonable.

While plaintiffs' counsel also requests attorneys' fees for his work performed in direct connection with this case after it was referenced to the Interstate Commerce Commission and while before that Commission, no authority has been submitted to support that part of the request. If Congress had intended counsel fees to be paid on referred issues while before the Interstate Commerce Commission, it is only reasonable to believe it would have specifically provided such authority by statute, and 28 U.S.C. § 1398(b) would have been an appropriate place to do so. In the absence of any statutory provision for such fees, this Court declines to consider any allowance for attorneys' fees for the work performed while this case was before the Interstate Commerce Commission.

### COUNTERCLAIM

The counterclaim of International raises the same issues decided in Inter-national Transport v. United States, D.C., 337 F.Supp. 985 (1972). For the reasons there stated, among others, the counterclaim is hereby dismissed.

### The Injunction

Defendant International Transport, Inc., including its officers, employees, agents and representatives acting on its behalf, are hereby restrained and enjoined from transporting in interstate commerce and from participating in the transportation in interstate commerce under size and weight or so-called heavy hauler authority by motor vehicle on public highways for compensation, bombs of an approximate weight of 500 pounds and 750 pounds whether palletized or unpalletized, unless certificated authority is first obtained from the Interstate Commerce Commission authorizing such transportation or unless changes in the design or structure of such bombs inherently requires palletization or which prevents manual handling of such bombs as they are or as they may be slightly modified to permit manual handling of them.

Further, defendant International Transport, Inc., including its officers, employees, agents or representatives acting on its behalf, are hereby restrained and enjoined from transporting in interstate commerce and from participating in the transportation in interstate commerce under size and weight or so-called heavy-hauler authority by motor vehicle on public highways for compensation, of cannon ammunition or other ammunition which individually or boxed weighs 150 pounds or less unless certificated authority is first obtained from the Interstate Commerce Commission authorizing such carriage or unless changes in the design and structure of such ammunition inherently requires palletization and prevents manual handling of such ammunition.

It is so ordered.

17. ʹ49 U.S.C. § 322(b) (2), "The party who or which prevails in any such action may, in the discretion of the court, recover reasonable attorneys' fees . . . ."