479 F.2d 171
 TRI-STATE MOTOR TRANSIT CO., a corporation, et al., Appellees,
v.
INTERNATIONAL TRANSPORT, INC., a corporation, Appellant.
TRI-STATE MOTOR TRANSIT CO., a corporation, et al., Appellees,
v.
C & H TRANSPORTATION CO., INC., Appellant.
 Nos. 72-1337, 72-1391.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Feb. 13, 1973.
Decided April 20, 1973.
 
 Phillip Robinson, Austin, Tex., and William K. Johnson, Chicago, Ill., for International Transport, Inc. and C & H Transportation Co., Inc.
 Lawrence R. Brown, Kansas City, Mo., and Harry Horak, Fort Worth, Tex., for Tri-State Motor Transit Co. and others.
 Before GIBSON and ROSS, Circuit Judges, and BENSON, Chief District Judge.
 ROSS, Circuit Judge.
 
 
 1
 Tri-State Motor Transit Co. (Tri-State) brought these actions against International Transport, Inc. (International) and C & H Transportation Co., Inc. (C & H), in United States District Court under 49 U.S.C. Sec. 322(b)(2) requesting injunctive relief from continued "clear and patent" violations of the Interstate Commerce Commission Act. C & H and International had "heavy hauling" certificates and had started to haul 500 and 750 pound bombs and palletized ammunition.[1] Tri-State had operating rights as a munitions carrier and claimed that bombs and palletized ammunition could not legally be hauled by C & H and International under their "heavy hauling" certificates. The trial court granted the injunctions and awarded attorneys fees.[2] We reverse and remand with directions.
 
 International
 
 2
 International filed a tender or rate quotation to haul ammunition and bombs on April 13, 1967, effective April 15, 1967. Commencing May 17, 1967, and continuing to June 11, 1971, International transported 500 and 750 pound bombs. On June 14, 1967, Tri-State filed the complaint seeking to enjoin the transportation of 500 and 750 pound bombs and cannon ammunition. Subsequent to the filing of the complaint International began to haul cannon ammunition which, when not boxed or palletized, weighed less than 150 pounds.
 
 
 3
 On June 30, 1967, the district court issued a preliminary injunction enjoining International from further transportation of cannon ammunition of an individual weight of less than 150 pounds. The court held that such cartage was a "clear and patent" violation of International's certificate. 49 U.S.C. Sec. 322(b)(2). With regard to the bombs, the court said, "The decision as to the bombs is obviously of the type Congress intended to be decided in the first instance by the Interstate Commerce Commission in the exercise of its expertise." In effect, the court referred the issue to the Interstate Commerce Commission (Commission).
 
 
 4
 On December 31, 1968, the Commission ruled that such cartage was not within International's certificate of authority. On March 18, 1970, a three-judge court reviewing the Commission's decision remanded the case. International Transport, Inc. v. United States, 318 F.Supp. 763 (W.D.Mo.1970). The United States, a statutory defendant, admitted that the Commission's order was invalid. The three-judge court suggested that the Commission take further evidence and consider the following regulation:
 
 
 5
 "Care in loading, unloading, or other handling of explosives. No bale hooks or other metal tools shall be used for the loading, unloading, or other handling of explosives, nor shall any package or other container of explosives, except barrels or kegs, be rolled . . . ." 49 C.F.R. Sec. 177.835 (b).
 
 
 6
 The Commission held further hearings and affirmed its previous order. International and others filed another complaint to set aside the two Commission orders. Once again the United States answered and admitted the invalidity of the two Commission orders. The three-judge court reviewed the Commission decision and affirmed it. International Transport, Inc. v. United States, 337 F.Supp. 985 (W.D.Mo.1972).
 
 
 7
 The United States appealed the decision to the Supreme Court and the decision was affirmed without opinion. United States v. Interstate Commerce Commission, 409 U.S. 904, 93 S.Ct. 235, 34 L.Ed.2d 168 (1972).[3]
 
 
 8
 The government's opposition to the Commission rulings was apparently predicated upon the argument that the Commission had failed to take into account the National Transportation Policy's provision relating to economical and efficient service. See 49 U.S.C. Secs. 1 et seq., 301 et seq., and 1001 et seq. During the interim between the three-judge decision and the appeal to the Supreme Court, the district court held a hearing and decided this case holding that cartage of 500 and 750 pound bombs and cannon ammunition weighing 150 pounds or less was clearly and patently in violation of International's certificate. An injunction was issued and attorneys fees of $10,894.37 were awarded.
 
 C & H
 
 9
 Tri-State filed its complaint for injunction against C & H on January 21, 1969. The action was stayed and the Commission asserted primary jurisdiction. C & H participated in the above-mentioned Commission proceedings, and in the subsequent three-judge court proceedings. On appeal the three-judge court decision adverse to C & H was affirmed without opinion by the Supreme Court. See C & H Transportation Co. v. Interstate Commerce Commission, 409 U.S. 904, 93 S.Ct. 235 (1972). C & H had stopped hauling the bombs in March of 1970. The single judge district court enjoined C & H from further hauling bombs, and allowed $4,557.00 in attorneys fees. The court did not enjoin C & H's alleged transportation of cannon ammunition in view of the uncertainty of the evidence and the small quantity involved.
 
 Clear and Patent
 A. The Bombs
 
 10
 Both International and C & H argue that transportation of the 500 and 750 pound bombs was apparently justified since the bombs, while not "inherently" requiring the use of special equipment to handle them, certainly as a practical matter were handled in a more expeditious manner when palletized and loaded and unloaded by special equipment. Both truckers contend that, until the Supreme Court rendered its decision affirming the three-judge court, there was a real question about the validity of the Commission's decisions. International and C & H point to the government's admission in the three-judge court and before the Supreme Court that the Commission's decisions were in error. From this fact the truckers assert that it is erroneous to now claim that the truckers "clearly and patently" operated without their authority, since the question of the lawfulness per se of the activity was certainly debatable. We agree with this reasoning.
 
 
 11
 49 U.S.C. Sec. 322(b)(2) provides in pertinent part:
 
 
 12
 "(2) If any person operates in clear and patent violation of any provisions of section 303(c), 306, 309, or 311 of this title, or any rule, regulation, requirement, or order thereunder, any person injured thereby may apply to the district court of the United States for any district where such person so violating operates, for the enforcement of such section, or of such rule, regulation, requirement, or order. The court shall have jurisdiction to enforce obedience thereto by a writ of injunction or by other process, mandatory or otherwise, restraining such person, his or its officers, agents, employees, and representatives from further violation of such section or of such rule, regulation, requirement, or order; and enjoining upon it or them obedience thereto."
 
 As this Court has said:
 
 13
 "The foregoing section was a 1965 amendment, the purpose of which was to 'afford injured parties a measure of self-protection against operations which are openly and obviously unlawful'. 1965 U.S.Code Cong. & Adm. News, Vol. 2, at p. 2931. Prior thereto only the Commission could go into District Court and obtain an enforcement order. Obviously, the Congress desired to expedite the remedy where 'clear and patent' violations were established." Baggett Transportation Co. v. Hughes Transportation, Inc., 393 F.2d 710, 714 (8th Cir.), cert. denied, 393 U.S. 936, 89 S.Ct. 297, 21 L. Ed.2d 272 (1968). (Emphasis supplied.)
 
 
 14
 And it is important to note that Congress "wish[ed] to emphasize . . . that the district courts of the United States should entertain only those actions under these sections, as amended, which involved clear and patent attempts to circumvent regulations in the areas involved." Conference Report 810, 89th Congress 1st Sess. (1965); U.S.Code, Cong. & Admin.News at 2943 (1965). (Emphasis supplied.) Further legislative history indicates:
 
 
 15
 "These new provisions are intended to afford injured parties a measure of self-protection against operations which are openly and obviously unlawful. In each new paragraph the words 'clear and patent' are used and are intended as a standard of jurisdiction rather than as a measure of the required burden of proof. As was stated in the Senate report on S. 2560, 87th Congress (S.Rept. 1588, 87th Cong., dated June 13, 1962), in explanation of an amendment to section 222(b) of the act which is identical to that proposed in this legislation:
 
 
 16
 No district court is to entertain any action except where the act complained of its openly and obviously for-hire motor carriage without authority under the sections enumerated above * * *. The language of the section is designed to make it clear that the courts would entertain only those suits which involve obvious attempts to circumvent operating regulation." (Emphasis supplied.)
 
 
 17
 House Report No. 253, 89th Congress 1st Sess. (1965); U.S.Code, Cong. & Admin.News at 2931 (1965).
 
 
 18
 The principal question in this case thus becomes whether C & H and International were engaged in an open and obvious attempt to circumvent operating regulations by hauling the 500 and 750 pound bombs.
 
 
 19
 In 1959 the Commission decide W. J. Dillner Transfer Co-Investigation of Operations, 79 M.C.C. 335 (1959). See also W. J. Dillner Transfer Co. v. I.C.C., 193 F.Supp. 823 (W.D.Penn.), aff'd Dillner Transfer Co. v. United States, 368 U.S. 6, 82 S.Ct. 16, 7 L.Ed.2d 16 (1961). The Dillner decision clearly indicated that a heavy hauler could not successfully base his right to transport on the size and weight of the item palletized unless the items themselves were such that palletization was inherently required.
 
 
 20
 However, in 1966 the Commission decided Moss Trucking Co., Inc., Investigation of Operations, 103 M.C.C. 91 (1966). Acknowledging the Dillner decision, the Commission said:
 
 
 21
 "As we discussed above, the term 'require' in its context is susceptible to varying interpretations, as may be seen from the language of our cases and certain court decisions. At one extreme it may be argued that to say that the transportation of a certain commodity 'requires' the use of special equipment means that it must be a physical impossibility to handle the commodity in any other manner, or, to state the proposition in the converse, a bare physical possibility that the commodity can be transported without the use of special equipment is sufficient to establish that the movement is beyond the scope of heavy-hauling authority. This has not been the view of the Commission, as it evidenced by the Black exception approved in the Dillner criteria, but it was the tendency toward this type of interpretation that the court in Aero condemned.
 
 
 22
 "On the other hand, it has been contended from time to time in heavy-hauler cases that any time special equipment is utilized in loading and unloading, or for over-the-road movement, the transportation falls within the permissible range of heavy-hauling operations, regardless of whether the use of such equipment can be said in any sense to be 'required.' Such a construction goes too far in that direction . . . .
 
 
 
 * * *
 "It seems to us that what the court in Aero is saying is that more latitude must be exercised in determining whether the use of special equipment is required. Industry practice, while not to be the determinative factor, must be taken into account. Not whether manual handling is possible, but whether it is 'reasonably practical' must assume a larger role in our determination." Id. at 107-108.
 In a dissent, Commissioner Murphy said:
 "The report sets forth a new test for determining whether aggregated items may be transported by a heavy hauler. In lieu of the test based upon the inherent nature of the commodity to be transported, as set forth in Dillner, it proposes that economy, efficiency and practical necessity be the controlling consideration.
 
 
 
 23
 * * *
 
 
 24
 "As a result of this decision, if the Dillner principle still exists, and evidently the majority believes it does, I fear that it here has been so masticated that it is incapable of application, leaving a void in our regulation of motor carriers." Id. at 115.
 
 
 25
 It is pertinent to note that Moss approved the heavy hauler's cartage of an aluminum tank, 20 feet long, with an uncrated weight of 273 pounds.
 
 
 26
 After the institution of the 1967 self-help suit against International it did not become certain for five years that the heavy haulers were violating their certificated authority. The trial judge in the International case indicated that the decision with regard to the bombs should in the first instance be decided by the Commission. Although this holding cannot properly be construed as an adjudication that no "clear and patent" violation had taken place, it may be correctly construed as an indication of the trial judge's opinion that Commission expertise was needed.
 
 
 27
 In 1968, the initial Commission decision, although nominally concluding that such cartage was "beyond question" outside the scope of heavy hauler authority, recognized that Moss, supra, phrased the issue not as whether manual handling is "physically possible," but whether it is reasonably practical taking into account several factors including industry practice. International Transport, Inc.-Investigation and Revocation of Certificates, 108 M.C.C. 275, 276 (1968). In somewhat contradictory language, in light of its "beyond question" suggestion, the Commission said:
 
 
 28
 "Looking, first of all, at the bombs as individual units, respondent argues that they are of such weight as to render them incapable as a practical matter of loading and unloading other than by mechanical devices, and we agree that the hand lifting of any 500- or 750-pound object would be a formidable task even for the sturdiest of men. In the same vein, it undoubtedly is true that in light of modern technology the use of forklift trucks or similar devices is more efficient and economical than manual handling of any description. Be that as it may, the record contains uncontradicted evidence that when suitably protected 500- or 750-pound bombs have, to some extent, been loaded and unloaded by rolling them on and off the trailers by hand, and we find nothing to persuade us that this procedure when employed was unsatisfactory. It is true that 500-pound bombs are now being produced without the hooks which formerly necessitated the use of protective bands. But aside from this there is no proof which would indicate that, in their basic characteristics, the newer models differ to any material degree from those which apparently were rolled without complaint. By the same token, no plausible technical explanation has been presented, as to why the involved bombs, with or without hooks, could not, should the military and the shippers so desire, again be coated or wrapped in the manner necessary to guard them against the normal hazards such as scratching which are encountered during the rolling process." Id. at 293.
 
 
 29
 Furthermore, in 1970 when this first Commission decision was being reviewed by the three-judge court, the United States, a statutory defendant, admitted the Commission's decision was unreasonable and in conflict with National Transportation Policy in finding that International's size and weight certificate did not authorize transportation of 500 and 750 pound bombs. The three-judge court remanded the case to the Commission to consider the applicability of a Department of Transportation regulation seemingly indicating that the bombs could not be rolled, and suggested that the Commission take further evidence on the manual handling of bombs and the handling of bombs by rolling, in addition to other evidentiary matters. International Transport, Inc. v. United States, supra, 318 F.Supp. at 765.
 
 
 30
 By 1971 the second Commission decision was handed down, and the Commission recognized that:
 
 
 31
 "Such objects, we admit, clearly fall within the weight range (i. e., substantially more than 200 pounds) which has been historically recognized as indicating a lack of suceptibility to manual lifting.[26] Thus, the dimensions of the involved bombs must be said to operate in favor of the heavy-hauler's right to handle them." See MC-C-5766 (October 29, 1971) as quoted in International Transport, Inc. v. United States, supra, 337 F. Supp. at 993.
 
 The Commission further recognized:
 
 32
 "In this connection, there is evidence pointing toward the use of hand rolling to load and unload the 500- and 750-pound bombs which were manufactured prior to 1966. Like such formerly made articles, the bombs transported by International are round objects and thus lend themselves, in theory at least, to handling by similar means. The currently produced 500- and 750-pound bombs differ, however, from the previously shipped models in that the former are slimmer and have smooth skins. Moreover the 500-pound bombs are now shipped without the suspension lugs which had been used to affix the shipping bands necessary to protect the bombs from such physical damage as might otherwise result in the rolling process." Id. at 993-994.
 
 
 33
 Finally, in 1972, after five years had elapsed since it had first been alleged that the appellants clearly and patently operated outside their certificated authority, a three-judge court affirmed the Commission's decision in the face of the admission by the United States that both prior Commission orders were invalid. International Transport, Inc. v. United States, supra, 337 F.Supp. at 985. The United States perfected a direct appeal to the Supreme Court in which the Solicitor General indicated once again that the Commission's decisions were invalid.
 
 
 34
 In view of the foregoing, we cannot say that the carriers were engaged in a "clear and patent" attempt to operate outside their authority.
 
 B. Cannon Ammunition
 
 35
 It appears that International transported two truck loads of cannon ammunition subsequent to the filing of the complaint (June 14, 1967), but before the issuance of the preliminary injunction (June 30, 1967). International claims that this cartage was not a clear and patent violation, and further claims that activities taking place solely after the complaint cannot be considered by the district court.
 
 
 36
 The first contention by International is plainly without merit. Cannon ammunition weighing less than 150 pounds unpalletized is not within heavy hauler authority. It appears, almost universally, that items weighing less than 200 pounds unpalletized have been considered susceptible to manual handling and, therefore, outside heavy hauler authority. See e. g., Ace Doran Hauling & Rigging Co.-Investigation, 108 M.C.C. 717, 723 (1969). See also Pittsburgh & New England Trucking Co. v. United States, 345 F.Supp. 743 (W.D.Pa.1972), aff'd sub nom. Ace Doran Hauling & Rigging Co. v. Interstate Commerce Commission, 409 U.S. 1070, 93 S.Ct. 686, 34 L.Ed.2d 660 (1972).
 
 
 37
 The second contention relates to International's assertion that Congress did not intend that the district courts should exercise jurisdiction over carriers' activities which occur solely after the filing of the complaint. No persuasive authority is cited for this proposition, and F.R.Civ.P. 15(d) allows for the filing of a supplemental complaint setting forth allegations occurring after the filing of the complaint. This is apparently what transpired below:
 
 
 38
 "The parties and the Court have treated the issues as continuing to the date of trial and have allowed discovery as to what was being transported in the last six months of 1971. The Court considers the pleadings to be amended accordingly to conform to the proof. Also, for the same reason the Supplemental Complaint of plaintiffs is deemed filed as of February 17, 1972, to conform to the proof. See Rule 15 F.R.Civ.P." Tri-State Motor Transit Co. v. International Transport Co., supra, 343 F.Supp. at 593-594 n. 9.
 
 Conclusion
 
 39
 For the reasons hereinbefore set forth, we hold that no clear and patent violation was shown with respect to either carrier's cartage of the bombs, but that a clear and patent violation was proven as to the cartage of the palletized cannon ammunition by International. As a consequence the decision enjoining C & H from the cartage of bombs and the award of attorneys fees will be reversed. The decision finding International in violation with respect to the cartage of the bombs will be reversed and the injunction dissolved. The decision finding International in violation with respect to the cartage of the cannon ammunition and enjoining further cartage of cannon ammunition will be affirmed. The attorneys fees awarded in the International case will be adjusted by the trial court to reflect this partial reversal. All costs will be taxed to Tri-State in the C & H case except the costs of the intervenor, Interstate Commerce Commission. Each party, including the intervenor, will pay its own costs of printing briefs in the International case, and the other costs, including the printing of the appendix and supplementary appendix, will be assessed equally to Tri-State and International.
 
 GIBSON, Circuit Judge (dissenting in part):
 
 40
 I agree with the majority decision on the palletized cannon munitions but also think C & H and International were engaged in a clear and patent attempt to circumvent operating regulations by hauling the 500 and 750 pound bombs.
 
 
 41
 The regulation of the commercial trucking industry is entrusted to the Interstate Commerce Commission by Congress. The ICC has been specifically granted the authority to establish classifications of carriers. 49 U.S.C. Sec. 304(b). In the exercise of this authority the ICC has created some 17 classifications of carriers; among these are the heavy haulers and the munitions haulers. The test for inclusion in the authority of the heavy haulers' certificates is generally whether the commodity, by virtue of its size or weight, necessitates the use of special equipment, primarily in loading and unloading. The so-called munitions haulers carry explosives and other dangerous articles. The classification of carriers is generally oriented toward the type of commodity carried, however with the heavy haulers, the classification has become descriptive of the type of service that they offer. The heavy haulers have tried to take advantage of this change in their status to expand the type of commodities which they carry. The ICC however has remained consistent in its refusal to allow the heavy haulers to enter into the carriage of classes of commodities which have been the subject of specialized certification, i. e. household goods[1] and bulk fungibles.[2]
 
 
 42
 The heavy haulers had not engaged in this type of hauling before and they should have, in the interest of orderly procedure, applied to the ICC for a permit or a change in regulations before invading a field heretofore reserved to the special permit carriers of explosives. Palletization is undoubtedly a beneficial technological advance in the cargo field and the public should reap the benefit from such a technological advance. However, in the interest of the regulatory scheme and to prevent chaos in the transportation field, the ICC should have control of any changes sought to be imposed by those taking advantage of palletization techniques in other classified fields. This is in accord with the Congressional scheme of entrusting the ICC with the overall supervision of public carriers and their classifications.
 
 
 43
 Judge Hunter correctly set forth the criteria for classifying cargo and recognized the historical evolution of the use of palletization in the transportation field.[3] The Commission has consistently refused to recognize the size and weight standard as the sole standard in determining heavy haulers' certificated rights and has emphasized the nature of the commodity to determine if the defendants' carriage of a commodity is a "clear and patent" violation of their certificated authority. The fact that the commodity carried is one which has historically been the subject of a specialized certificate, coupled with the ICC's refusal to allow expansion of the heavy haulers' certificates into existing commodity classifications, should give a reasonable person notice to proceed cautiously before invading another specialized field and the violation would appear to be clear and patent. Earlier the Commission in W. J. Dillner Transfer Co., Investigation of Operations, 79 M.C.C. 335, decided April 10, 1959, dealt with the problem of aggregating or palletizing as follows:
 
 
 44
 "(3) In bundling, aggregating, or palletizing, it should be the general rule of construction (1) that the individual 'commodity itself' is the controlling consideration as respects a carrier's authority; (2) that the limited exception which the Black case, 64 M.C.C. 443, represents, where commodities are bundled for protection or as otherwise required by their 'inherent nature' must be maintained within its strictest limits; (3) that the minimum bundle which is required by the 'inherent nature' of the commodity is the size or type of bundle which must be considered in any determination whether necessity exists for the use of special equipment; and (4) that in order reasonably to maintain these limits it shall be presumed, in the absence of a sound basis for concluding to the contrary, that commodities tendered to the carrier, in bundles or aggregations, are within the general rule and not within the limited exception thereto . . . ." 79 M.C.C. at page 358.
 
 
 45
 "Thus, only under unusual circumstances may aggregation or bundling result in a situation where such commodities may thereby be recognized as requiring special equipment. This is a special exception to the long-recognized general rule which looks at 'the commodity itself,' it is no sense applicable where bundling is done on the basis of economy and efficiency; * * * and we wish to emphasize the obvious necessity for maintaining such exception within its strictest limits." 79 M.C.C. 352.
 
 
 46
 While the effect of Dillner was somewhat obscured by the Moss Trucking Co., Inc., Investigation of Operations, 103 M.C.C. 91 (1966), allowing the heavy haulers to carry aluminum tanks, 20 feet in length and weighing 273 pounds, the Commission made clear in Moss that size and weight were not to be the determining factors by stating:
 
 
 47
 "On the other hand, it has been contended from time to time in heavy-hauler cases that any time special equipment is utilized in loading and unloading, or for over-the-road movement, the transportation falls within the permissible range of heavy-hauling operations, regardless of whether the use of such equipment can be said in any sense to be 'required.' Such a construction goes too far in that direction, of course, not only because it would render the word 'require' virtually meaningless, but also because it would enable the shippers, solely at their discretion, to open up, through palletization or otherwise, a field of service to the heavy haulers which has never been a part of heavy-hauling service and which would constitute an unwarranted invasion of traffic traditionally handled by general-commodity carriers." 103 M.C.C. at 107. (Emphasis added).
 
 
 48
 The heavy haulers' attempt to justify new ventures into exotic fields by overreading Moss or as construing that decision as superseding Dillner, is not justified. The Commission's response to this overreading of Moss was set forth in Hughes Transportation Company, Inc., Extension, 107 M.C.C. 207 (1969); "Moreover, the Moss decision clearly does not authorize the incursions by heavy haulers into numerous specialized fields as chemical and explosives transportation." Notwithstanding this history and the Commission's consistent decisions in the heavy haulers' field, International continued the hauling of the bombs in issue. The Interstate Commerce Commission had already ruled on December 31, 1968, that International did not possess authority to transport the bombs. Yet it appears only fair and reasonable that since the ICC's decision had been made, International would continue to operate in violation of that decision only at its own risk. This it did and continued the transporting of the bombs until June 11, 1971. Having done so, it should bear the consequences. While the outcome of the referred ICC case and the subsequent affirmances on appeal are not determinative of the issue of clear and patent violation in this case, which must be resolved on the facts as they existed at the time the suit was filed, the results of these cases strongly indicate that defendants' claim of right to haul these bombs has little merit.
 
 
 49
 Of further significance is the fact that no other heavy haulers have ever asserted any right to haul explosives, apparently applying a reasonable construction to the language of their certificates. The one exception to this is the carriage of jet thrust units, a class A or B explosive, by heavy haulers, but even this was done, not under the size and weight authority, but under the generic authority as a missile part. See, Baggett Transportation Co., Extension-Redstone Arsenal, 88 M.C.C. 3 (1965). From this record, it was most unlikely that the ICC would permit the heavy haulers to carry the bombs on the authority of their heavy haulers' certificate. While the palletization of the bombs might have put the question into a gray area of the law with regard to size and weight authority alone, the fact that the commodities were explosives becomes the overriding consideration in determining the authority to carry them.
 
 
 50
 Also, historically the hauling of explosives has been treated as a separate and unique type of cargo. The ICC issues certificates to haul explosives only for a period of five years in order to allow a periodic review of the safety record of the carrier on application for renewal. The fact that the heavy haulers' certificate contains no such limitations on duration indicates that the ICC did not intend that explosives be carried under the general authority of the heavy haulers' certificate.
 
 
 51
 The majority attaches considerable significance to the fact that the Government in its position as a statutory defendant and presumably representing the Department of Defense and not the Interstate Commerce Commission had taken issue with the Commission's ruling on not allowing the large palletized bombs to be transported under the heavy haulers' certificate. I would not view this of major significance because the Department of Defense was not invested with the authority to classify carriers and the Government in this posture was merely taking an adversary position in presenting what it considered to be a policy issue under the National Transportation Policy, 49 U.S.C. Sec. 301, preface. In any event, this would call merely for a court challenge of the ICC's expertise and should not supply the basis for violating existing regulations. Moreover, the Government's position in the ICC proceedings and the appeal from the decision therein is more than offset by the intervention of the ICC in the instant suit on the behalf of plaintiffs. Where the ICC, as the independent agency charged by Congress with the responsibility of regulating the transportation industry, argues that a violation of operating rights is a clear and patent violation, its actions should be accorded great weight and certainly more weight than the Department of Justice which is urging a position based on the self-interest of a government agency, the Department of Defense.
 
 
 52
 If the contention of the heavy haulers is sound, they would be in a position to virtually monopolize the hauling of all commodities which lend themselves to aggregation or palletization. Recognizing this obvious danger the Commission has stated:
 
 
 53
 "[W]e must be alert to keep [the heavy haulers] reasonably within their recognized sphere unless and until they have established the right to depart therefrom on the basis of authority acquired therefor on a showing of a public need as required by part II of the act." W. J. Dillner Transfer Co., supra at 357.
 
 
 54
 Invariably some plausible argument can be advanced for hauling any type of commodity under any type of permit and if we are to give credence to any attempted invasion of another carrier's field by the mere fact that an issue is raised, the self-help statute Sec. 322(b) (2) would be rendered meaningless as it could always be contended, despite prior Commission's rulings, that the violation was not clear and patent. I do not think this result is in accord with the obvious intent of Sec. 322(b).
 
 
 55
 I would, therefore, affirm the decision of the District Court on the basis of Judge Hunter's opinion.
 
 
 
 [1]
 A "heavy hauler" measures its certificate in terms of whether the commodity hauled, by virtue of its size or weight, necessitates the use of special equipment. As in this case, questions arise as to whether the commodity can be loaded and unloaded manually or whether the commodity must be aggregated and loaded and unloaded with special equipment such as forklift trucks
 
 
 [2]
 Tri-State Motor Transit Co. v. International Transport, Inc., 343 F.Supp. 588 (W.D.Mo.1972) and Tri-State Motor Co. v. C & H Transportation Co., Inc., 347 F.Supp. 879 (W.D.Mo.1972)
 
 
 [3]
 In its jurisdictional statement, the government said:
 [T]he Commission found that beginning in 1966 the Department of Defense had required all shipments of the involved bombs to be palletized. These shipments weighed from 1700 to more than 3000 pounds; they were loaded into standard closed van haulers by means of fork-lift trucks furnished by the Department of Defense. The decision to ship the bombs palletized, the Commission determined, was not made for reasons of safety, but because "it is the most rapid and efficient method of handling the involved traffic."
 The Commission then proceeded to review its past decisions interpreting the scope of heavy hauler authority. The Commission pointed out that commodities requiring "special equipment" (e. g., fork-lift trucks) for loading and unloading are within heavy hauler authority. Problems have arisen, however, when commodities not "incapable of manual handling" on an individual basis are aggregated into heavy bundles which must then be loaded by mechanical means. The Commission has taken the view that the mere aggregation of a commodity into a heavy shipment should not be sufficient to bring it within the heavy hauler's sphere, and has ruled instead that aggregated commodities will be held to "require" special equipment only if their "inherent nature" demands that they be aggregated. Commodities shipped in bundles merely for reasons of economy and efficiency do not "inherently require" aggregation, in the Commission's opinion, and are accordingly outside heavy hauler authority. Only by adopting this "inherent nature" test, the Commission believed, could it stop the heavy hauler's " 'unwarranted invasion of traffic traditionally handled by' " other carriers.
 As for explosives haulers, the Commission stated that "due significance" must be accorded the "traditions and precedents which have established explosives transportation as one of the most distinctive and unique spheres of motor carriage." This tradition plus the "inherent nature" test, the Commission concluded, result in a "presumption" that explosives are not within heavy hauler authority. This presumption is not overcome, in the Commission's view, by showing that the aggregation of the explosives into heavy loads represents industry practice or constitutes the most economical and efficient means of handling the explosives, or even that technology has rendered manual loading obsolete.
 Applying these tests to the bombs in question, the Commission held them to be outside heavy hauler authority. Although it would be a "formidable task" to lift manually these 500 and 750 pound bombs, the Commission noted that such bombs had formerly been loaded manually by rolling. Admitting that the bombs are no longer designed with the protective bands which permitted such rolling, the Commission stated that nevertheless "no plausible technical explanation" was presented to show that they could not again be so designed. Further, the Commission found that palletization "is of recent institution, is employed almost entirely for reasons of economy and efficiency, and is in no way required by considerations such as safety." Accordingly, the Commission held that the bombs do not "inherently require" palletization, despite Defense Department insistence on it, and that the heavy hauler had not overcome the presumption against its authority.
 
 
 [26]
 See the Doran report supra, 108 M.C.C. 717, at 723; Telischak Trucking, Inc., Extension-Concrete Commodities, 82 M.C.C. 109 (1959)
 
 
 [1]
 Neptune Storage, Inc., Extension-X Ray Machines, 88 M.C.C. 3 (1961)
 
 
 [2]
 Ashworth Transfer Co., Extension-Cement, 64 M.C.C. 99 (1955). In Ashworth the heavy hauler alleged that it was authorized to carry dry bulk cement because it required special equipment and because of its weight. The ICC held that its certificated authority did not include the carriage of this commodity. Part of the language used by the ICC is of interest here
 "We have tended to the use of general terms in the interest of reasonable rather than burdensome regulation, and such terms have been, for the most part, fairly construed by motor carriers according to their obvious intent. However, we appear to have here a complete and deliberate misconstruction of a commodity description. . . ." 64 M.C.C. at 100.
 
 
 [3]
 Judge Hunter in his opinion refers to the prior Three-Judge Court decision International Transport, Inc. v. United States, 337 F.Supp. 985, 999 (W.D.Mo.), aff'd, 409 U.S. 904, 93 S.Ct. 235, 34 L.Ed.2d 168 (1972), in summarizing the criteria or guidelines as follows:
 "The said guidelines, all of which by way of emphasis, have been developed in prior cases, may be described as follows: (1) the basic characteristics, if any, of the commodity which occasion the use of special equipment; (2) prevailing industry practice with regard to its handling; (3) the manner in which it or analogous commodities have historically been shipped, and (4) its traditional sphere of carriage."